J. Clark AKERS, III, and William W. Dillon, III, Individually and as part owners of Middle Fork Hunt Club, and John Tudor and Sam Harwell, Individually and as part owners of Davy Crockett Hunting Club, all citizens and residents of Davidson County, Tennessee, Plaintiffs,

and

The National Wildlife Federation and the Tennessee Conservation League, nonprofit corporations, Plaintiffs-Intervenors,

v.

Stanley R. RESOR, Individually and as Secretary of the Army, Lt. Gen. Frederick J. Clarke, Individually and as Chief of Engineers, Corps of Engineers, Col. John V. Parish, Jr., Individually and as District Engineer, Corps of Engineers, Rogers C. B. Morton, Individually and as Secretary of the Interior, and Greer Ricketson, Chairman, Game and Fish Commission of the State of Tennessee, et al., Defendants,

M. V. Williams and West Tennessee Tributaries Association, Dyer County Levee and Drainage District No. 1, City of Union City, Tennessee, Town of Rives, Tennessee, Town of Obion, Tennessee, City of Dyersburg, Tennessee, Town of Trenton, Tennessee, Town of South Fulton, Tennessee, City of Bells, Tennessee, City of Fulton, Kentucky, Intervening Defendants.

Civ. No. C–70–349.

United States District Court,
W. D. Tennessee, W. D.

Jan. 27, 1978.

Charles H. Warfield, Nashville, Tenn., for original plaintiffs.

Charles F. Newman, Memphis, Tenn., for intervening plaintiffs.

W. J. Michael Cody, U. S. Atty., W. Hickman Ewing, Jr., Asst. U. S. Atty., Memphis, Tenn., for federal defendants.

Barret Ashley, Dyersburg, Tenn., for intervening defendants M. V. Williams and West Tennessee Tributaries Association.

E. T. Palmer, M. Watkins Ewell, Jr., Dyersburg, Tenn., for intervening defendant Dyer County Levee & Drainage District No. 1.

Fenner Heathcock, Union City, Tenn., for remaining intervening defendants.

Bobby L. Stratton, Nashville, Tenn., for amicus curiae Tennessee Wildlife Resources Agency.

## MEMORANDUM DECISION

### BAILEY BROWN, Chief Judge.

This action was brought to challenge the sufficiency of the defendant Corps of Engineers' attempts to comply with the requirements of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq., and the Fish and Wildlife Coordination Act of 1958, 16 U.S.C. § 661 et seq., with regard to the Corps' West Tennessee Tributaries Project. This court determined in 1972 that the previous environmental impact statement compiled by the Corps for this project did not meet NEPA standards. The Corps has now prepared a revised EIS.

We have held an extensive evidentiary hearing in this matter, and the parties have submitted briefs dealing with the legal and factual issues presented. This opinion constitutes the court's findings of fact and conclusions of law.

By agreement of the parties, we now address only the issue of the adequacy of the EIS under NEPA.[1] For the reasons stated in this opinion, the court concludes that the present EIS is not sufficient to meet NEPA standards.

## BACKGROUND.

The West Tennessee Tributaries Project was initially authorized by the Flood Control Act of 1948, P.L. 80–858, 62 Stat. 1171.[2] The Congress subsequently modified the project by providing for relocation of gas transmission lines dislocated by the work, and for the purchase of mitigation lands to preserve fish and wildlife resources and to protect recreational and environmental interests. Flood Control Act of 1966, P.L. 89–789, § 207, 80 Stat. 1418; Water Resources Development Act of 1974, P.L. 93–251, § 3, 88 Stat. 16.

The project contemplates enlargement and realignment of the main stem and tributary channels of the Obion River and the Forked Deer River. The purpose of the project is to reduce flooding in the surrounding area.

Work was started on the project in the early nineteen-sixties, and is now roughly thirty-two percent complete.

This lawsuit was filed in 1970. This court determined in 1972 that both NEPA and the Fish and Wildlife Coordination Act standards are applicable to the Corps' action in deciding to continue work on this partially completed project, and that such agency action is reviewable under 5 U.S.C. § 706. *Akers v. Resor,* 339 F.Supp. 1375 (W.D.Tenn.1972).

Subsequently, this court determined that the Corps had failed to comply with NEPA requirements as to the adequacy of the Environmental Impact Statement, and enjoined the Corps from

> any new construction of flood control and drainage improvements on the Obion and Forked Deer Rivers and their tributaries, as authorized under Public Law No. 526, 79th Congress, 2d Session, approved July 24, 1946, and Public Law No. 858, 80th Congress, 2d Session, approved June 30, 1948 . . .[3]

---

1. Thus, we do not deal at this time with the following issues:
 (1) whether the Corps has complied with the additional, substantive requirements of NEPA; and,
 (2) whether the Corps has complied with applicable law regarding the acquisition of mitigation lands for the project.

2. Of ancillary importance is the Flood Control Act of 1946, P.L. 79–526, 60 Stat. 641. That legislation authorized the Tiptonville-Obion levee project, and also authorized the Corps to expend a portion of certain appropriations for clearing and snagging operations where necessary for flood control.

3. Certain exceptions to the general prohibition against work on the project were provided in the original injunction, and other such exceptions have subsequently been created by order of the court. These exceptions fall generally into two classes:
 (1) work essentially unrelated to the project which does, however, involve some degree of channelization or other clearing.
 (2) work which, although a part of the project, is deemed to have no appreciable environmental impact, where a special need for early completion exists.

and retained jurisdiction of this cause. Memorandum Decision entered December 28, 1972, C–70–349 (W.D.Tenn.); Final Judgment entered March 2, 1973, C–70–349 (W.D.Tenn.). Thereafter the second EIS, now before the court, was filed.

ADEQUACY OF EIS AS TO ENVIRON-MENTAL IMPACTS, INCLUDING UNA-VOIDABLE ADVERSE ENVIRONMEN-TAL EFFECTS.

NEPA clearly requires the Corps in these circumstances to make a detailed statement on the environmental impact of the project, and on any adverse environmental effects which cannot be avoided should the project be completed. 42 U.S.C. § 4332(2)(C)(i), (ii).

*Environmental Impacts*

There can be no question that alterations in the runoff capacities of the rivers and tributaries involved, leading to the draining of some surrounding lakes and wetland areas and to changes in flooding patterns and frequency, would constitute the primary environmental impacts caused by project completion. In fact, the cost benefit analysis applied by the Corps in the EIS depends largely on the effect such impacts would have on the character of the land involved and on flood risks.

The EIS projects, for example, significant changes in the relative occurrence of lakes, wetlands, woodlands, and farmlands in the project area. These changes would necessarily alter both productive and recreational uses of these lands, as well as altering the area's ecological balance and aesthetic qualities. Further, the EIS projects reduced flood damage to crops and increased flood protection for urban areas.[4]

The EIS deals adequately with the effect the project would have on the relative oc-currence of lakes, wetlands, woodlands, and farmlands in the area. While there is some disagreement about the extent of drainage and other changes which would occur, the Corps has fully set forth its own views in the EIS, and has also included opposing viewpoints on the matter.

The same cannot be said with regard to treatment of the project's flood control aspects in the EIS. It is true that the EIS contains a great deal of language concerning expected flood control impact, and resultant economic benefits.

■ However, at no point does the EIS set out the frequency, duration, or extent of flooding to be expected under current conditions. The EIS does not attempt to identify particular areas of the total project area which are subject to different levels of flood risk. Nor does the EIS predict what impact project completion would have on such expected flooding. Further, there is no attempt to break expected flooding into seasonal projections, in order to measure the actual impact of such flooding on agricultural activities.[5]

The EIS does attempt to describe the flood control impact of the project in terms of a design flow statistic of 1.05. However, the EIS gives no comparable statistic to describe current conditions, so it is not possible to determine from the EIS what improvement, if any, would result from project completion.

More importantly, neither the EIS nor the Corps' expert witnesses who testified at the hearing of this cause present any understandable explanation of what the 1.05 figure means. The most probable interpretation is that this figure represents that in a period of 105 years, floodwaters will rise

---

4. The projection of increased flood protection in urban areas is questionable in light of the fact that completion of the project will *increase* flooding in some areas, including the town of Dyersburg. See *Unavoidable Adverse Environmental Effects, infra.*

5. The Corps contends that some additional information regarding flood impact is present in back-up data not actually included in the EIS. While it is certainly permissible for an EIS to refer to additional information of ancillary importance without actually reprinting that information in the EIS, the flood control information here concerned is of central importance in the West Tennessee Tributaries Project and must be included in the EIS. The present EIS does not alert the reader to the existence of back-up flood control data, nor to the significance of such data. In these circumstances, even if the existence of such back-up data were proved, the deficiencies of the EIS would not be cured.

over the banks of the river on 100 occasions. Assuming, arguendo, that this interpretation is correct, the 1.05 figure still does not describe the duration or extent of the flooding expected to occur, nor does it describe the frequency of flooding for particular areas within the over-all project area.

 The Sixth Circuit has had opportunity to comment on the purpose of the environmental impact statements required by NEPA, and on the approach to be followed in reviewing their adequacy. An EIS must contain information adequate to permit Congress and the public, as well as the executive branch, to evaluate a project in light of its environmental risks, and to compare the project as proposed with possible alternatives. It is not necessary that an EIS be perfect, or that it contain "every particle of knowledge" available to the responsible agency. Rather, the adequacy of an EIS must be measured by standards of practicability and reasonableness. *Natural Resources Defense Council v. T. V. A.,* 502 F.2d 852 (6th Cir. 1974); *Environmental Defense Fund v. T. V. A.,* 492 F.2d 466 (6th Cir. 1974).

 The information contained in the West Tennessee Tributaries EIS now before this court simply does not contain information which would enable the reader to form any meaningful conclusions about the impact of the project on flooding in the area. This deficiency flies in. the face of the NEPA requirement for a detailed statement on the environmental impact of the proposed action. 42 U.S.C. § 4332(2)(C)(i). Moreover, the lack of meaningful information concerning project impact on flooding is particularly critical in light of the fact that the proof now before the court demonstrates that the primary justification for the project is flood control, and the Corps concedes that only a low degree of flood protection will be obtained in any event. The Corps' failure to include necessary information regarding flood control in the EIS raises serious questions about the validity of portions of the economic analysis used to justify the project.

*Unavoidable Adverse Environmental Effects*

 Additionally, the proof shows that completion of the presently unfinished portions of the project upstream will result in more flooding than is presently experienced in the areas surrounding the now complete downstream portions of the project. This would be true, for example, with regard to the town of Dyersburg, which is one of the more heavily populated parts of the project area.

The EIS not only fails to quantify the extent of increased downstream flooding which would occur; the EIS fails to point out, in understandable language, that such a phenomenon would occur.

In these circumstances, the present EIS does not satisfy the NEPA requirement for a detailed statement of environmental impacts and unavoidable adverse environmental effects. It cannot possibly satisfy the statutory purpose of providing information to Congress and to the public.

ADEQUACY OF EIS AS TO ALTERNATIVES TO THE PROPOSED ACTION.

 NEPA requires that an EIS contain a detailed statement of alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii). The EIS now under consideration by this court does include some discussion of possible alternatives to completion of the project. The alternatives discussed include the use of reservoirs, channel cleanout, leveed floodways, flood plain zoning, flood insurance, flood proofing, and government purchase of easements or of fee title to the land in question. Additionally, the EIS does contain discussion regarding the possibility of abandoning the project.

Unfortunately, the Corps' treatment of alternatives suffers from the same deficiency as its treatment of project completion, in that it is impossible to determine from the EIS the frequency, duration, and extent of present or future flooding. Since impact on flooding is one of the most important environmental impacts to be expected should the project be completed, and since the major justification advanced for the project is

flood control, this information is critical to a fair comparison of alternatives with the proposed action.

Additionally, the EIS fails to consider the alternative of deferring further work on at least some portions of the project pending the acquisition of surrounding mitigation lands authorized and required by the Water Resources Development Act of 1974.

The Corps appears to take the position that, because the Congress has addressed certain aspects of the mitigation lands question in that legislation, the EIS need not deal with the issue. This argument does have appeal where the Congress has addressed the particular point in question, as by directing the Corps to acquire 32,000 acres of mitigation lands for this particular project.

However, in the circumstances presented here, the court believes an analysis of such alternative to be essential. The proof demonstrates clearly that further work on the project will make acquisition of mitigation lands in the surrounding area more expensive, and the land available less valuable for mitigation purposes because of increased clearing of land. While the Water Resources Development Act does place some constraints on the Corps' use of appropriated funds for the purchase of mitigation lands, it would clearly be possible for the Corps to purchase mitigation lands prior to completing work on sections of the project in close proximity to those mitigation lands.

The Congress obviously considered it important to provide mitigation lands in conjunction with the project. The EIS must contain information on alternative acquisition plans for these mitigation lands, since the acquisition plan ultimately adopted would have a significant impact on the cost of and quality of the mitigation land acquired and on the Corps' ability to effectuate the Congressional policy manifested in the Water Resources Development Act.

Because of these deficiencies, the present EIS does not meet NEPA requirements as to discussion of possible alternatives to the proposed action.

## CUMULATIVE IMPACT OF THE WEST TENNESSEE TRIBUTARIES PROJECT WITH OTHER PROJECTS.

The Corps has taken the position that it is unnecessary for the EIS to address the cumulative environmental impacts which this project will produce in conjunction with other projects. This court cannot agree.

The full environmental impact of a proposed federal action cannot be gauged in a vacuum. The standards of practicability and reasonableness by which the adequacy of an EIS must be measured surely dictate that the cumulative impacts of one project with other projects need not be set forth in the same detail as the direct impacts of that project. The same standards of practicability and reasonableness dictate that such cumulative impacts must not be ignored. The Council on Environmental Policy has recognized this in CEQ Guideline 1500.8:

> The statements should also succinctly describe the environment of the area affected as it exists prior to a proposed action, including other federal activities in the area affected by the proposed action which are related to the proposed action. The interrelationships and cumulative environmental impacts of the proposed action and other related projects shall be presented in the statement.

■ This court holds that an EIS must account for cumulative impacts by providing the following information:

(1) a list of projects producing related or cumulative impacts;

(2) a brief but understandable summary of the expected environmental impacts to be produced by those projects with specific reference to additional impact information where such information is available; and

(3) a reasonable analysis of the combined or cumulative impacts of all the projects.

For example, the present EIS should provide some information regarding the combined impact of the Tiptonville Levee and Diversion Project and the West Tennessee Tributaries Project. It should also provide information regarding the cumulative ef-

fects of this project and other projects on the wetlands of the lower Mississippi Valley. It should be emphasized that this includes the projects of other agencies, as well as the Corps' own projects.

The present EIS is deficient in this regard, since it fails to go beyond the direct impacts expected from the West Tennessee Tributaries Project.

## CONSULTATION WITH FEDERAL AGENCIES.

NEPA requires that:

> Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved.

42 U.S.C. § 4332(2)(C).

■ In holding the previous EIS for this project inadequate, the court noted that the Corps had not consulted with the Soil Conservation Service of the Department of Agriculture, even though that agency had "issued a memorandum to the effect that channelization should not be effected where the purpose is to bring new lands into agricultural production." At the hearing of this cause, Durley McLarty, chief of the section of the Corps which prepared the present EIS, admitted that he had not consulted with the Soil Conservation Service on this matter and did not know whether such a policy existed. The EIS does not mention this matter.

Obviously, the Corps has failed to consult with the Soil Conservation Service as required by NEPA.

The court might note at this juncture that, as plaintiffs suggest, the Corps has been less than diligent in soliciting and considering the views of other federal and state agencies. The court does not, at this time, make a finding that the Corps has actually acted in bad faith in the preparation of this EIS. However, since the Corps must prepare a more adequate EIS for this project anyway, the court would be remiss in not suggesting that the Corps be more receptive to divergent viewpoints. This does not mean, of course, that the Corps may not reject those viewpoints in good faith and after a careful and objective analysis on the merits.

## CONCLUSION.

The completion of this project obviously will cost a substantial amount of money and will have some detrimental effects on the environment of the area. The justification for the completion of the project is that such will reduce flooding. And yet the environmental impact statement does not tell us or even estimate when or where flooding will be reduced; and the EIS does not tell us that, admittedly, completion of the project will actually increase flooding in areas in which the project has already been completed, such as in the Dyersburg area. Thus there is no way, using the EIS, for a decision-maker—be he Congressman, employee of the executive department concerned with budgeting, Chief of the Corps of Engineers or other—to make a rational decision as to whether it is in the overall public interest to complete this project. This, together with the other defects pointed to in this memorandum, requires this court to hold that the EIS now before the court does not meet the requirements of NEPA.

Accordingly, it is hereby determined:

That the injunction entered in this cause March 2, 1973 by this court remain in effect pending compliance by defendants with NEPA requirements.

That this court will retain jurisdiction over this cause.

That this court will review any revised environmental impact statement for the West Tennessee Tributaries Project, if requested to do so by plaintiffs.

The Clerk will enter a final judgment consistent with this memorandum decision.