[Civ. No. 52617. Second Dist., Div. Three. Jan. 17, 1979.]

JOHN WHITMAN et al., Plaintiffs and Appellants, v.
BOARD OF SUPERVISORS OF VENTURA COUNTY et al.,
Defendants and Respondents;
PHOENIX WEST OIL AND GAS CORPORATION,
Real Party in Interest and Respondent.

## COUNSEL

Hathaway, Clabaugh, Perrett & Webster and E. E. Clabaugh, Jr., for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, and Norman N. Flette, Deputy Attorney General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Dorothy L. Schechter, County Counsel, and R. Thomas Harris, Assistant County Counsel, for Defendants and Respondents.

Loebl, Bringgold, Peck & Parker and William L. Peck for Real Party in Interest and Respondent.

## OPINION

REA, J.*—Petitioners appeal from a judgment of the superior court denying their petition for extraordinary relief in the nature of mandamus and/or prohibition against the Board of Supervisors of Ventura County (the Board) for unlawfully and wrongfully granting a conditional use permit to Phoenix West Oil and Gas Corporation (Phoenix), the real party in interest.[1]

### STATEMENT OF THE CASE

On June 27, 1975, Phoenix filed an application for a conditional use permit (CUP) to drill a single exploratory oil and gas well in the so-called Sisar Creek area of the Upper Ojai Valley in Ventura County. The Sisar Creek area apparently embraces limited oil and gas operations, but is adjacent to the productive Silverthread area, all of which is part of the Ojai Oil Field. Silverthread is considered to be a major oil field and is located to the south, southeast and southwest of the proposed project site. In recent years, there has been a substantial increase in the number of wells drilled and in total production in the Silverthread area, but a negligible increase in Sisar Creek. New drilling in the Sisar-Silverthread area produced 11 new wells in 1972, 14 new wells in 1973, 15 new wells in 1974, and approximately 17 new wells in 1975.

The project site is considered to be in an extreme fire hazard area. The Upper Ojai Valley in which it lies is characterized as a rural residential and agricultural community with an approximate population of 320 persons. There are residences approximately one-fourth mile from the proposed drilling site. The topography of the Upper Ojai Valley is hilly and mountainous terrain with slopes ranging from 10 percent to 40 percent. The area of the project site is approximately one-half mile south of the Las Padres National Forest and can be described as an undisturbed, natural chapparal. Sisar Creek is approximately 2,000 feet west and 4,000 feet south of the proposed site.

In addition, the project site is a wild life habitat wherein there is evidence of deer, coyote, 50 species of birds, black bear, mountain lion, gray fox, raccoon, bobcat, weasel, chipmunk, rabbit, gopher, mice, skunk,

---

*Assigned by the Chairperson of the Judicial Council.

[1]Petitioners withdrew their request for a preliminary injunction at the time of the hearing on the issuance of the writ.

and native snakes and lizards. It is also within the flying area of the California condor.

Access to the site is via State Highway 150 to Koenigstein Road. It is necessary to travel through the City of Ojai or the City of Santa Paula to reach the project site. Highway 150 is a 24-foot wide, paved, 2-lane roadway; there are curves along its path. Koenigstein Road is a 14-foot wide county road which intersects Highway 150. Oil drilling equipment and materials must be trucked in and out of the project site by way of Highway 150.

Upon the filing of the application for a CUP by Phoenix, the county's planning staff conducted an initial study of the proposed project and recommended preparation of a negative declaration, meaning that an environmental impact report (EIR) would not be required. On July 8, 1975, the county's Environmental Assessment Committee (EAC) reviewed the recommendation of the planning staff and concurred with their determination that a negative declaration would be sufficient. The county's Environmental Report Review Committee (ERRC) subsequently reviewed the EAC's determination as to the sufficiency of the negative declaration and, on August 6, 1975, the ERRC, in part due to substantial landowner protestations, found that the proposed project would have a substantial adverse effect on the environment and reversed the EAC's determination. As a result, an EIR was required to be prepared for the proposed project. The planning division staff thereafter prepared the draft EIR for CUP-3543 and submitted it to the ERRC. On November 12, 1975, the ERRC determined that the draft was sufficient.

On November 21, 1975, S. H. Stewart, one of the petitioners herein, appealed the ERRC's decision, on an administrative level, to the county's Environmental Quality Advisory Committee (EQAC). On December 5, 1975, the EQAC upheld the ERRC's determination that the draft EIR for CUP-3543 was sufficient.

On December 13, 1975, John Whitman, another of the petitioners herein, appealed the decision of the EQAC to the Board. On January 13, 1976, the Board found that the EIR for CUP-3543 was sufficient and denied the appeal.

Phoenix' application for CUP-3543 was ultimately approved by the planning commission at its March 4, 1976, meeting, subject to 59 conditions. Following a successful appeal to the Board by Phoenix of

seven of the conditions, the Board, on April 27, 1976, granted CUP-3543. A "Notice of Determination" for CUP-3543 was filed with the county clerk on May 7, 1976.

Petitioners filed their action for extraordinary relief on June 4, 1976, seeking to have CUP-3543 set aside on the ground that its appendant EIR was inadequate, inaccurate, and insufficient. The trial court denied the relief sought and this appeal followed.

## CONTENTIONS

Petitioners contend: (1) that the EIR for CUP-3543 does not comply with the requirements of the California Environmental Quality Act of 1970 (CEQA) (Pub. Resources Code, § 21000 et seq.) and the state EIR guidelines (Cal. Admin. Code, tit. 14, § 15000 et seq., hereinafter cited as Guidelines); (2) that there was insufficient evidence and findings to support the granting of CUP-3543; (3) that the trial court erred by refusing to conduct a hearing or consider any objections, corrections or amendments to its proposed findings of fact and conclusions of law; and (4) that attorneys' fees should be allowed upon remand or reversal.

██ Phoenix controverts all of the above contentions.[2]

## DISCUSSION

██ As will be developed in the discussion which follows, we conclude that the EIR prepared for CUP-3543 is fatally deficient in its failure to adequately discuss the cumulative impacts on the environment

[2]Phoenix also submits that this appeal should be dismissed on the ground that petitioners have failed to comply with Public Resources Code section 21167, subdivision (c), which requires that any action or proceeding alleging that an EIR does not comply with the provisions of CEQA be commenced within 30 days after the local agency has filed notice of its decision to approve or carry out a project, as is required by subdivision (a) of Public Resources Code section 21152. The record on appeal establishes that the "Notice of Determination" for Phoenix' proposed project was filed on May 7, petitioners' petition was filed on June 4, 1976. Clearly, the filing was timely. Phoenix, however, further argues that petitioners failed to comply with the provisions of Public Resources Code section 21167.5, which states that proof of prior service by mail upon the public agency of notice of the commencement of the action must be filed with the initial pleading. Here, petitioners obtained a court order allowing filing without proof of prior service. Personal service of the petition on the Board was thereafter made the same day that it was filed. As it appears that Public Resources Code section 21167.5 sets forth merely a notification and not a jurisdictional requirement, and it further appearing that there was substantial compliance with the statute, we find no merit in Phoenix' argument on this point.

associated with the proposed project. As we have determined that the case must be reversed and remanded for further proceedings in view of this defect, we will deal only briefly with the parties' other significant contentions and arguments.

■ We note preliminarily that under sections 21168 and 21168.5 of the Public Resources Code, which govern the scope of judicial review in cases coming under CEQA, the trial court does not exercise its independent judgment in reviewing the actions of the administrative agency; rather, the trial court's role is to determine whether the decision and findings of the agency are supported by substantial evidence. (See *Gabric* v. *City of Rancho Palos Verdes* (1977) 73 Cal.App.3d 183, 193 [140 Cal.Rptr. 619]; see also *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74-75, fn. 3 [118 Cal.Rptr. 34, 529 P.2d 66].) Since the trial court proceedings in the present case were conducted under the substantial evidence test, we must do likewise. (*Mountain Defense League* v. *Board of Supervisors* (1977) 65 Cal.App.3d 723, 728 [135 Cal.Rptr. 588]; *Neely* v. *California State Personnel Bd.* (1965) 237 Cal.App.2d 487, 489 [47 Cal.Rptr. 64].)

I

SUFFICIENCY OF THE EIR FOR CUP-3543

In enacting CEQA, our Legislature established a policy directed at the maintenance, development, and enhancement of a high quality environment for the people of this state. (Pub. Resources Code, §§ 21000, 21001.) Recognizing this to be the intent of the Legislature, our Supreme Court has declared that the provisions of CEQA should "be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

At the heart of CEQA is the EIR requirement. (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) An EIR is defined in Public Resources Code section 21061 as "an informational document," the purpose of which "is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the

significant effects of such a project might be minimized; and to indicate alternatives to such a project."[3]

The Supreme Court has observed that an EIR also serves "to demonstrate to an apprehensive citizenry that the [responsible public] agency has in fact analyzed and considered the ecological implications of its action." (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 86; see also *People* ex rel. *Dept. Pub. Wks.* v. *Bosio* (1975) 47 Cal.App.3d 495, 528 [121 Cal.Rptr. 375].) Indeed, full compliance with the EIR process has been recognized as necessary to enable the public "to determine the environmental and economic values of their elected and appointed officials, thus allowing for appropriate action come election day should a majority of the voters disagree." (*People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 842 [115 Cal.Rptr. 67].)

With the foregoing as background, we turn now to a discussion of petitioners' specific criticisms of the subject EIR.

1. ▮▮▮ *Cumulative Impacts*

The EIR prepared for CUP-3543 contains the following paragraph under the heading "Cumulative Impact": "The cumulative impact [*sic*] associated with this project and the two other projects in the area which are pending or have been approved and not constructed include increased traffic on State Route 150 and a minor increase in air emissions." Petitioners contend that this analysis of the cumulative impacts of Phoenix' oil drilling project falls far short of what is demanded under CEQA and the Guidelines. We agree.

The question of the degree to which an EIR must discuss the possible cumulative effects of a project has, until now, received little consideration in this state. Although the necessity of preparing an EIR is not in issue here, the county having finally determined that one was required, we note at the outset that subdivision (b) of Public Resources Code section 21083 mandates the preparation of an EIR whenever the possible environmental effects of a project are "individually limited but cumulatively considerable." ▮▮ ▮▮▮ In 1976 subdivision (b) was amended by the addition of language defining the term "cumulatively considerable" to mean "that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects,

---

[3]As to the specifics of what must be included in an EIR, see Public Resources Code sections 21100 and 21100.1 and Guidelines section 15140 et seq.

the effects of other current projects, and the effects of probable future projects." (Stats. 1976, ch. 1312, § 10, p. 5893, eff. Jan. 1, 1977.)[4]

Once it is determined that an EIR is necessary, Guidelines section 15143, subdivision (e), requires that there be included therein a description of the "cumulative and long-term effects" of the proposed project on the environment. Additional recognition of the need to discuss cumulative impacts in an EIR is found in Guidelines section 15142, which states: "An EIR must include a description of the environment in the vicinity of the project, as it exists before the commencement of the project, from both a local and regional perspective. *Knowledge of the regional setting is critical to the assessment of environmental impacts.* Special emphasis should be placed on environmental resources that are rare or unique to that region. *Specific reference to related projects, both public and private, both existent and planned, in the region should also be included, for purposes of examining the possible cumulative impact of such projects.*" (Italics added.)

In *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017], our Supreme Court termed section 15142 of the Guidelines a "vital provision" which "directs reference to projects, existent and planned, in the region so that the cumulative impact of all projects in the region can be assessed."

In *People* v. *County of Kern, supra,* 39 Cal.App.3d 830, the court, in a footnote, touched briefly upon the subject of cumulative impacts in discussing whether or not an EIR prepared for a development should have taken account of other, similar developments in the vicinity. As

[4]Phoenix argues that the definition of "cumulatively considerable" contained in the 1976 amendment to Public Resources Code section 21083, subdivision (b), can have no application to the assessment of the sufficiency of the instant EIR since the EIR was prepared before the effective date of the amendment. The amendment, however, may be viewed as simply clarifying a concept that was already existent in the statute rather than as adding to it. (*Forde* v. *Cory* (1977) 66 Cal.App.3d 434, 438 [135 Cal.Rptr. 903].) In any event, Phoenix' primary objection to the application of the amendment—that it requires an appraisal of "probable future projects"—is of no consequence here since, as will be discussed *infra,* the EIR for CUP-3543 is insufficient for its failure to adequately discuss the cumulative impact of the other *existing* or *currently planned* projects in the area.

Petitioners and amicus curiae point out that Guidelines section 15023.5 defines the concept of "cumulative impacts" in the following terms: "Cumulative impacts refer to two or more individual small effects which, when considered together, are considerable or which compound or increase other environmental impacts. The individual effects may be changes resulting from a single project or a number of separate projects." We agree with Phoenix, however, that this section of the Guidelines is not applicable here since its historical note specifically states that compliance with its provisions is not mandatory before January 1, 1977, which was after the instant EIR was prepared.

noted by the court: "The final EIR makes no mention of the combined impact of these projects on the environment. . . . We believe the Attorney General is correct when he contends that the final EIR also should consider and comment upon the overall impact of the Rancho El Contento project and the other projects now in progress in Cuddy Valley regardless of their current state of development. [Citations.]" (*Id.,* at p. 842, fn. 8.)

Under the analogous National Environmental Policy Act (NEPA), 42 United States Code section 4321 et seq. (see *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, 260-261; *San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 593 [122 Cal.Rptr. 100]), the federal courts have reached even more specific conclusions regarding the nature of the cumulative impacts discussion requirement. For example, in *Natural Resources Defense Council* v. *Callaway* (2d Cir. 1975) 524 F.2d 79, the circuit court held that the Navy's environmental impact statement (EIS) on the dumping of dredge spoil at a specific site was legally insufficient because it failed to discuss the possible cumulative effects of other proposed dumping projects, both private and governmental, in the area. In discussing the degree of inquiry necessary to satisfy the mandate of NEPA, the court stated: "[A]n agency may not . . . [treat] a project as an isolated 'single shot' venture in the face of persuasive evidence that it is but one of several substantially similar operations, each of which will have the same polluting effect in the same area. To ignore the prospective cumulative harm under such circumstances could be to risk ecological disaster. . . . [¶] . . . [T]he [Council on Environmental Quality] Guidelines for preparation of impact statements emphasize that consideration should be given not only to the action that is the subject of the EIS but also to 'related Federal actions and projects in the area, and *further actions contemplated* . . . [citation], and direct that the 'interrelationships and cumulative environmental impacts of the proposed action and other related Federal projects shall be presented in the statement,' [citation]." (*Id.,* at p. 88; italics in original.)

In *Akers* v. *Resor* (W.D.Tenn. 1978) 443 F.Supp. 1355, the federal district court, in holding the EIS prepared for an Army Corps of Engineers' project to be inadequate for failure to discuss cumulative impacts, stated: "The full environmental impact of a proposed federal action cannot be gauged in a vacuum. The standards of practicability and reasonableness by which the adequacy of an EIS must be measured surely dictate that the cumulative impacts of one project with other projects need not be set forth in the same detail as the direct impacts of

that project. The same standards of practicability and reasonableness dictate that such cumulative impacts must not be ignored." (*Id.*, at p. 1360.) The court went on to hold the following three elements necessary to an adequate discussion of cumulative environmental impacts: "(1) a list of projects producing related or cumulative impacts; (2) a brief but understandable summary of the expected environmental impacts to be produced by those projects with specific reference to additional impact information where such information is available; and (3) a reasonable analysis of the combined or cumulative impacts of all the projects." (*Ibid.*)

The court in *Akers* additionally noted that the EIS prepared by an agency should provide information concerning all related projects in the area, and not just those within the control of the agency. (*Id.*, at pp. 1360-1361.)

█ The inadequacy of the cumulative impact discussion in the EIR prepared for CUP-3543 is manifest. The entire discussion constitutes but one sentence. Its only reference to related projects in the region is to "the two other projects in the area which are pending or have been approved and not constructed . . . ." Presumably this reference is to an oil transfer station to be constructed by Transworld Oil Company some 3.25 miles southeast of the Phoenix project and to four "development wells" to be constructed about 3.75 miles southeast of the Phoenix well, both of which projects are mentioned briefly at an earlier point in the EIR under the title "Environmental Setting." Yet, the record before us discloses that the area surrounding Phoenix' proposed project contains a great deal more drilling than is referred to in the EIR's discussion of cumulative impacts.[5]

---

[5]The draft EIR contains a map prepared by the State Division of Oil and Gas which indicates a large number of operational oil wells in the area of Phoenix' proposed project. Phoenix, itself, in its appeal of the conditions contained in the CUP, acknowledged that 39 wells have been drilled in the immediate area since 1970. Further, the Board and Phoenix, in their joint response to the petitioners' pleadings herein, stated: "The area . . . has substantial oil operations already there. . . . Other drilling operations, ranging from new wells to drilling out and opening up older wells, still go on on a regular basis in the immediate area of this drilling site and an EIR is generally not required."

In addition, a declaration attached to the joint response states: "There have been 80 wells drilled within a one mile radius of the Phoenix West drill site, 51 of which are presently shown by the State of California Division of Oil and Gas as presently productive wells. In closer proximity to the site, there are 12 producing wells shown by the Division of Oil and Gas within one half mile of the site, the nearest well being just 1100 feet from the site. Oil storage facilities are present along Koenigstein Road 1700 feet south of the site."

The Board's attitude toward the degree of comprehensiveness necessary in a cumulative impact discussion is reflected in its responses to the critical comments received from the public on the issue. Typical of the Board's responses is the following: "The [draft] EIR notes on page 6 those related projects which have recently been approved and/or are pending County approval. Both projects are over 3 miles from the project area and generally would not have a cumulative impact on the Upper Ojai Valley. Although new oil drilling may be pending in the area, many existing permits allow unlimited drilling in their permit area without additional County approval. There is no feasible basis for estimating future drilling activity which is unrelated to the County permit process. In addition, the projection of possible projects would be based on speculation. . . . The Guidelines do not require a cumulative analysis of *possible* projects." (Italics in original.)

But even if at the time the instant EIR was prepared it was not necessary for its cumulative impact discussion to take into account the effect of "probable future projects" (see fn. 4, *ante*), Guidelines section 15142 nevertheless mandated that the EIR contain specific references to "both existent and planned" related projects in the region for the purpose of analyzing possible cumulative impacts. Despite this requirement, the EIR before us omits all direct reference to the extensive existing oil production activity in the area. Furthermore, the Board's assumption that it need only be concerned with other planned projects for which a county permit is required ignores the fact that Guidelines section 15142 refers to "both public and private" related projects in requiring a description of the regional setting. While it may be true, as Phoenix' counsel asserted at oral argument, that oil companies are generally reticent regarding their plans for future drilling, there is nothing in the record to indicate that the Board even made an attempt to ascertain what plans the private companies had for expansion of their operations in the area.[6]

---

[6]Indeed, it may be questioned whether the instant EIR adequately deals with Phoenix' own future drilling plans. CUP-3543 was issued subject to numerous conditions, one of which provided as follows: "That drilling operations shall be restricted to one (1) well location only, provided however, that upon filing a modification application to and upon approval by the Planning Commission, additional wells may be drilled within the area for which the permit is issued, but such additional wells shall be subject to all conditions stated herein and any additional conditions which may be specified at the time such approval for additional well or wells is granted."

At the request of amicus curiae and pursuant to Evidence Code sections 452 and 459, we have taken judicial notice of the fact that subsequent to the issuance of CUP-3543, the Board modified the CUP to permit the drilling of five additional wells without the preparation of a new or modified EIR. (Minutes of the Sept. 22, 1977, meeting of the Ventura County Planning Committee.) While it would be improper to base our holding herein upon events occurring solely after the preparation of the subject EIR and the

In addition to its failure to make adequate reference to existing or planned drilling in the area, the instant EIR is also deficient in its analysis of the few cumulative impacts which are discussed. That discussion is limited to the statement that the cumulative impacts associated with the two other planned projects coming within the county's permit process "include increased traffic on State Route 150 and a minor increase in air emissions."

■ We recognize that the "sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible" and that perfection is not required. (*San Francisco Ecology Center* v. *City and County of San Francisco, supra,* 48 Cal.App.3d 584, 594; see also Guidelines, § 15150 (eff. Jan. 1, 1977).) On the other hand, the courts have favored specificity and use of detail in EIRs since " '[a] conclusory statement "unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind" not only fails to crystallize issues [citation] but "affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives." [Citation.]' " (*People* v. *County of Kern, supra,* 39 Cal.App.3d 830, 841-842, quoting *Silva* v. *Lynn* (1st Cir. 1973) 482 F.2d 1282, 1285.)

■ Here, the cumulative impact discussion in the EIR lacks even a minimal degree of specificity or detail. Rather, the "discussion" is but a conclusion utterly devoid of any reasoned analysis of the type suggested in *Akers* v. *Resor, supra,* 443 F.Supp. 1355, 1360. The use of phrases such as "increased traffic" and "minor increase in air emissions," without further definition and explanation, provides neither the responsible agency nor the public with the type of information called for under CEQA.[7]

issuance of CUP-3543, the facts just detailed strongly suggest that the six total wells granted to Phoenix should either have been treated as a multiple or phased project with one EIR (see Guidelines, § 15069), or that the EIR prepared for the first exploratory well should have given at least some consideration to Phoenix' further drilling plans in the event that first well proved successful. It is difficult to accept that an EIR prepared for a single well adequately covered all the impacts associated with five additional wells. (Also see Guidelines section 15068 which permits the application of a single EIR to a series of similar projects; section 15068, however, cannot be read as condoning the use of a single EIR to cover several projects when that EIR ignores the cumulative impacts associated with the projects.)

[7]We do not mean to imply that all data and analysis pertaining to cumulative impacts must be included in one section which is separate and apart from the remainder of the EIR, although that would be preferable. (See first paragraph of guidelines, § 15143.) If the EIR, read as a whole, adequately deals with the question of cumulative impacts, it will suffice. Here, for example, the EIR contains separate sections on both traffic impacts and air emissions. Had the cumulative effects of related projects been

## 2. *Consultation With Other Agencies*

Petitioners contend that not all public agencies having jurisdiction over resources which may be affected by Phoenix' proposed project were consulted, thereby rendering the EIR for CUP-3543 inadequate.

Public Resources Code section 21153 requires a public agency preparing an EIR to consult with and obtain comments from "any public agency which has jurisdiction by law with respect to the project . . . ."[8] The phrase "jurisdiction by law" was defined in Guidelines section 15029.6 at the time of the preparation of the EIR in the present case as follows: "(a) Jurisdiction by law means the authority of any public agency (1) to grant a permit for or provide funding for the project in question, or (2) to exercise authority over resources which may be affected by the project. [¶] (b) A city or county will have jurisdiction by law with respect to a project when the city or county is the site of the project, the area in which the major environmental effects will occur, and/or the area in which reside those citizens most directly concerned by any such environmental effects. . . ."[9] (Cal. Admin. Register 75, No. 1.)

Petitioners contend that the following public agencies having jurisdiction over resources affected by Phoenix' proposed project should have

discussed in those sections, the EIR would be adequate. However, except for the section labeled "Cumulative Impact" and a brief description of the two other pending projects within the county's permit system, the subject EIR deals with Phoenix' proposed project in isolation from other related projects in the area.

[8] At the time the instant EIR was prepared, Public Resources Code section 21153 read as follows: "Prior to completing an environmental impact report, every local agency shall consult with, and obtain comments from, any public agency which has jurisdiction by law with respect to the project, and may consult with any person who has special expertise with respect to any environmental impact involved." (Stats. 1972, ch. 1154, § 13, p. 2276.)

In 1977 the statute was amended so that it now reads: "Prior to completing an environmental impact report, every local lead agency shall consult with, and obtain comments from, each responsible agency and any public agency which has jurisdiction by law with respect to the project, and may consult with any person who has special expertise with respect to any environmental impact involved." (Stats. 1977, ch. 1200, § 14, p. 4002.)

The change in the statute's language is not pertinent to the issues raised here.

[9] Guidelines section 15029.6 has since been amended so that it now reads in pertinent part: "(a) Jurisdiction by law means the authority of any public agency (1) to grant a permit or other entitlement for use, (2) to provide funding for the project in question, or (3) to exercise authority over resources which may be affected by the project.

"(b) A city or county will have jurisdiction by law with respect to a project when the city or county having primary jurisdiction over the area involved is the site of the project, the area in which the major environmental effects will occur, and/or the area in which reside those citizens most directly concerned by any such environmental effects. . . ." (Cal. Admin. Register 78, No. 5.)

been consulted: City of Ojai, City of Santa Paula, United States Forest Service, The Farm Advisor, United States Soil Conservation Service, Regional Water Quality Control Board, Ojai Resource Protection District, San Antonio Water Conservation District, The Casitas Municipal Water District, California Department of Transportation, California Highway Patrol, and the Ojai Unified School District. It is difficult, if not impossible, for this court to determine with any exactitude which public agencies have the right to exercise authority over resources which may be affected by Phoenix' project. However, Phoenix' suggestion that the Board's obligation to consult with other agencies extended only to agencies having authority over oil and gas resources offers too narrow a construction of the consultation requirement. We believe it encompasses agencies having jurisdiction over all natural resources which may be affected by the project, including but not limited to air, water, soil, trees, plants, and shrubs, as well as animals in their natural habitat. Consistent with the Legislature's intent, the language of the statute must be given broad interpretation. (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, 259.) The record reflects that some of the public agencies alluded to by petitioners were in fact contacted. Others were provided with notice of the pending administrative hearings on the sufficiency of the EIR.

■ Ideally, all public agencies exercising authority over any natural resource which conceivably might be affected by a proposed project should be consulted. Likewise, if a city or county is the site of the project or in an area which may be subjected to major environmental effects from the projects, it should be consulted. The public agency responsible for the preparation and certification of the final EIR should seek out those other public agencies who exercise authority over natural resources of whatever nature and provide those agencies with ample opportunity to voice objection to any proposed project. The appropriate policy should be one of inclusion, not exclusion, of other public agencies.

As the cause must be remanded for further proceedings in view of our holding regarding the cumulative impact issue, we leave it to the Board, under the supervision of the superior court, to conduct further inquiry into the question of whether additional public agencies should be contacted with respect to CUP-3543.[10]

---

[10]In assessing which public agencies should have been solicited for their comments, the Board should seek assistance from appendix B to the Guidelines (foll. § 15203), which sets forth the areas of responsibility of state agencies with regard to various environmental concerns. (Cal. Admin. Register 76, No. 41.)

There is a comparable listing of federal and federal-state agencies in appendix II to the

### 3. *Discussion of Alternatives to Project*

Petitioners contend that there is an inadequate discussion of alternative drilling sites or alternative action in the subject EIR. We disagree. The final EIR for CUP-3543, including the responses to comments from the public, contains an adequate discussion of alternative drilling sites, diagonal drilling, whip stocking, and directional drilling. All were found to be infeasible. A "no project" alternative is also discussed in the EIR.

### 4. *Miscellaneous Matters*

■ Petitioners contend that the EIR before us is also deficient for its failure to consider the environmental impacts associated with an oil pipeline contemplated as an addition to the project.

The description of the project in the EIR states that if the well should prove successful "[a]ll products would be transported from the well sites [*sic*] by a pipeline. Approximately 1 oil field truck per day would be temporarily utilized to transport the oil from the site until [the] pipeline is constructed. . . ." The EIR is thereafter silent on the environmental effects expected from such a pipeline. In response to public criticism of this silence, the county's Planning Director stated: "[T]he placement of pipelines does not require a permit, and consequently, this activity is not subject to environmental review under CEQA." When CUP-3543 was granted, however, one of its conditions provided that a modification application would have to be approved by either the planning commission or the planning director before Phoenix could install a pipeline.

The facts just recited strongly suggest that the EIR for CUP-3543 should have addressed itself to the environmental consequences associated with the proposed pipeline. Guidelines section 15037 defines the term "project" as meaning "the whole of an action . . ."; the term refers to the underlying activity and "does not mean each separate governmental approval." (Guidelines, § 15037, subds. (a) and (c); see *Natural Resources Defense Council, Inc.* v. *Aracata Nat. Corp.* (1976) 59 Cal.App.3d 959, 969 [131 Cal.Rptr. 172].) The record before us reflects that the construction of a pipeline was, from the very beginning, within the contemplation of

Council on Environmental Quality Guidelines prepared for use in the implementation of NEPA. (See 40 C.F.R., pp. 835-839 (foll. § 1500.14) (1977).)

Phoenix should its well prove productive.[11] Although admittedly contingent on the happening of certain occurrences, the pipeline was, nevertheless, part of Phoenix' overall plan for the project and could have been discussed in the EIR in at least general terms. Even if the well and pipeline were viewed as parts of a "phased project," Guidelines section 15069 called for the preparation of a single EIR covering the "ultimate project."

The county's excuse for not dealing in the EIR with the pipeline's expected environmental impacts—namely, that no permit was required for the pipeline's placement—is subject to suspicion. Despite the assertion that no agency approval was required for the proposed pipeline, the county saw fit in the CUP to condition the pipeline's construction upon the prior approval of either the planning commission or planning director. Of course, it may be that approval to construct the pipeline has, in fact, never been obtained or even sought. Another possibility is that approval for the pipeline has been given, but only after the environmental consequences of the pipeline were fully explored. (E.g., a subsequent EIR may have been prepared in accordance with the provisions of Guidelines § 15067.) As these matters are beyond the scope of the record before us, we decline to express any further opinion on the subject.

Petitioners also complain that although CUP-3543 would permit the production of natural gas, its appendant EIR fails to give any consideration to the activity. Phoenix' proposal, however, appears to have been at all times directed to the production of oil; the gas petitioners refer to is apparently the kind associated with any oil well. The CUP adequately deals with the problems which might arise from the flaring off of this gas.

## II

### FINDINGS TO SUPPORT THE
### GRANTING OF CUP-3543

Petitioners also contend that the Board failed to prepare adequate written findings to support the granting of CUP-3543. Admittedly, we searched the record in vain for findings in the traditional or judicial format. Absence of such a document makes judicial review difficult.

---

[11]In fact, one of the conditions in the CUP *mandated* the construction of a product pipeline should the daily oil production either reach a level of 350 barrels or require more than two trucks to transport it from the site.

Phoenix submits, however, that adequate findings were adopted by the Board pursuant to procedures which the Board had earlier enacted for the conduct of hearings on land use matters coming before the planning commission and the Board itself. Among the procedures enacted was the following:

"C. *Decision*

"1. *Voting*:

"*.* . . . . . . . . . . . . . . . . .

"c. A motion to adopt or approve staff recommendations or simply to approve the action under consideration shall, unless otherwise particularly specified, be deemed to include adoption of all proposed findings and execution of all actions recommended in the staff report on file in the matter. . . ." Phoenix contends that by virtue of this provision, findings which had been proposed by the county's planning staff were adopted by the Board when it voted to certify the EIR as adequate and to approve the issuance of CUP-3543, albeit with modification of certain of the conditions which had been attached thereto.

We conclude that Phoenix is only partially correct. When the planning commission transmitted the staff's proposed findings to the Board for use in the latter's consideration of Phoenix' appeal regarding seven of the fifty-nine conditions upon which the planning commission had approved CUP-3543, the commission made the following recommendations: (1) that the Board certify the EIR as adequate, and (2) that the Board deny Phoenix' appeal as to the seven conditions. The Board subsequently did certify the EIR as adequate, but then disregarded the planning commission's advice as to the challenged conditions and upheld Phoenix' appeal. Thus, while under the above-quoted procedural rule the Board's decision to certify the EIR as adequate may be deemed an adoption of at least some of the staff's proposed findings, its decision to uphold Phoenix' appeal of the seven conditions, over the express recommendation of the planning commission to the contrary, must be deemed a rejection of those proposed findings upon which the challenged conditions were based. Under these circumstances, it was incumbent upon the Board to revise the staff's proposed findings, either through modification or addition, so that the findings supported the Board's decision on the

appeal.[12] The Board's failure to do so left an unbridged gap between the raw evidence and the Board's ultimate decision. (See *Mountain Defense League* v. *Board of Supervisors, supra,* 65 Cal.App.3d 723, 732.) On remand, the Board should make the findings necessary to support its sustaining of Phoenix' appeal.

## III

## FINDINGS IN THE TRIAL COURT

There is nothing in the record on appeal which supports petitioners' argument that the trial court improperly refused to consider or hold a hearing on petitioners' objections to the court's proposed findings of fact and conclusions of law. Further, it is within the discretion of the trial court to order a hearing on objections to proposed findings and conclusions (Cal. Rules of Court, rule 232(f)); it is not mandatory.

In addition, the question of the adequacy of the trial court's findings is of little consequence here. The trial court properly limited its function to a review of the sufficiency of the evidence supporting the Board's actions, and its determination was thus one of law rather than fact. Since this court is called upon to make the same legal determination (*Mountain Defense League* v. *Board of Supervisors, supra,* 65 Cal.App.3d 723, 728), we are not bound by the findings made in the court below.

## IV

## ATTORNEYS' FEES

Petitioners seek an award of attorneys' fees upon remand of the cause. The record reflects that at the outset of the hearing on the petition, counsel stipulated to reserve the question of attorneys' fees to a time later

---

[12]In fact, another section of the Board's operating procedures specifically provided for new findings in this type of situation. It read:

"C. *Decision*

" . . . . . . . . . . . . . . .

"2. *Findings:* On any matter for which State laws or County ordinances require the preparation of written findings, the staff report submitted on the matter shall contain findings proposed for adoption by the hearing body. Any motion directly or impliedly rejecting such proposed findings must include a statement of alternative or modified findings or a direction that the matter under consideration be continued for a reasonable amount of time in order for staff to prepare a new set of proposed findings consistent with the evidence which has been presented and the decision which is anticipated." This procedure was not followed here.

418

in the proceedings. The next reference to attorneys' fees is found in the trial court's conclusions of law, wherein they were denied.

Petitioners now argue that they should be allowed attorneys' fees on either of two theories: (1) that they have conferred a substantial benefit on an ascertainable class, and (2) that the Board's actions were arbitrary or capricious within the meaning of Government Code section 800.[13]

■ Addressing the last theory first, we find no support in the record for the assertion that the Board acted in an arbitrary or capricious manner. Given the complicated nature of CEQA and its Guidelines, it cannot be said that the Board failed to even attempt compliance with the law. (See *Healdsburg Police Officers Assn.* v. *City of Healdsburg* (1976) 57 Cal.App.3d 444, 457 [129 Cal.Rptr. 216].)

With respect to petitioners' first theory, we note that currently pending before our Supreme Court is the case of *Northington* v. *Davis* (L.A. 30731, hg. granted Feb. 3, 1977),* wherein the court will address the issue of attorneys' fees under the substantial benefit or "private attorney general" doctrines when only statutory, as opposed to constitutional, considerations are involved. (Cf. *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 46-47 [141 Cal.Rptr. 315, 569 P.2d 1303].)[14] Since the holding in *Northington* is likely to affect the result here, we deem it best that the question of attorneys' fees be deferred until at least all proceedings in the court below are completed, with the expectation that the Supreme Court will have reached its decision by that time.

[13]Government Code section 800 reads in pertinent part: "In any civil action to appeal or review the award, finding, or other determination of any administrative proceeding under this code or under any other provision of state law, except actions resulting from actions of the State Board of Control, where it is shown that the award, finding, or other determination of such proceeding was the result of arbitrary or capricious action or conduct by a public entity or an officer thereof in his official capacity, the complainant if he prevails in the civil action may collect reasonable attorney's fees, but not to exceed one thousand five hundred dollars ($1,500), where he is personally obligated to pay such fees, from such public entity, in addition to any other relief granted or other costs awarded. . . ."

[14]We also note that subsequent to the granting of a hearing in *Northington,* the Supreme Court granted a hearing in *Woodland Hills Residents Assn.* v. *City Council* (L.A. 30897, hg. granted Jan. 26, 1978),† which involves an attorneys' fees question substantially similar to that presented here.

*Reporter's Note: See 23 Cal.3d 955 [154 Cal.Rptr. 524, 593 P.2d 221] for Supreme Court opinion.

†Reporter's Note: See 23 Cal.3d 917 [154 Cal.Rptr. 503, 593 P.2d 200] for Supreme Court opinion.

DISPOSITION

The judgment is reversed and the cause remanded to the superior court with directions that the superior court remand the matter to the Board for further proceedings consistent with the views expressed herein, particularly with respect to the preparation of an adequate discussion of the cumulative impacts associated with Phoenix' project, the preparation of findings to support the sustaining of Phoenix' appeal of the conditions contained in the CUP, and a reassessment of the Board's compliance with the consultation requirement found in Public Resources Code section 21153. The question of attorneys' fees shall be deferred until all proceedings in the superior court associated with this action are completed. Petitioners will recover their costs on appeal.

Potter, Acting P. J., and Allport, J., concurred.