J. Clark AKERS, III, et al., Plaintiffs,

and

The National Wildlife Federation and The Tennessee Conservation League, Non-Profit corporations, Plaintiffs-Intervenors,

v.

Stanley R. RESOR, Individually and as Secretary of the Army, et al., Defendants,

and

M. V. Williams et al., Intervening Defendants.

Civ. A. No. C–70–349.

United States District Court, W. D. Tennessee, W. D. March 28, 1972.

Charles H. Warfield, Nashville, Tenn., for plaintiffs.

Charles F. Newman, Memphis, Tenn., for intervening plaintiffs.

Thomas F. Turley, Jr., U. S. Atty., and Kemper B. Durand, Asst. U. S. Atty., Memphis, Tenn., for federal defendants.

Lurton Goodpasture, Asst. Atty. Gen., State of Tenn., and Bart C. Durham, III, Asst. Atty. Gen., Nashville, Tenn., for state defendants.

Barret Ashley, Dyersburg, Tenn., for intervening defendants M. V. Williams and West Tennessee Tributaries Assoc.

E. T. Palmer and M. Watkins Ewell, Jr., Dyersburg, Tenn., for intervening defendant Dyer County Levee & Drainage District No. 1.

Fenner Heathcock, Union City, Tenn., for remainder of intervening defendants (Towns and Cities).

## MEMORANDUM DECISION

BAILEY BROWN, Chief Judge.

This is an action against the Secretary of the Army and others seeking a declaration that the Corps of Engineers, in continuing the project of channel enlargement and realignment of the Obion and Forked Deer rivers in northwest Tennessee, is in violation of certain federal statutes. Plaintiffs also seek injunctive relief. Plaintiffs Akers, Dillon, Tudor and Harwell bring this action in their own behalf and as members of hunting clubs located in the involved area. The National Wildlife Federation and the Tennessee Conservation League have intervened as plaintiffs. Several towns and cities located in the involved area as well as the West Tennessee Tributaries Association and a levee and drainage district have intervened as defendants.[1]

We have heretofore denied a motion to dismiss the intervening complaint and motions of plaintiffs and Federal de-

---

1. The Secretary of the Interior and certain officials of the State of Tennessee were likewise made defendants but, on motion and it appearing that no relief was sought against them and that they were unnecessary parties, the action was dismissed as to them.

fendants and intervening defendants for summary judgment.

This action was filed in the Middle District of Tennessee (later transferred here) and that Court entered an order which in effect maintained the status quo with respect to work to be done by the Corps of Engineers. Thereafter this Court rescinded that order with the understanding and agreement that the United States Attorney, in representing the Corps, would file a notice of intent to proceed at least 30 days prior to any action being taken by the Corps. The Corps was later allowed to proceed as to one item of the work (referred to in the record as the "Middle City" item, at Dyersburg) since it appeared clear that such work would have no appreciable effect on the ecology of the area. The Corps has since, on October 8, 1971, given notice of intent to proceed with respect to the "Menglewood" item, which caused the Court to hold a pre-trial conference to explore the necessity for a plenary hearing. It was the position of the plaintiffs at the conference that the Corps of Engineers could not proceed with its work in any event until Congress had funded the plan of mitigation tentatively proposed by the Corps[2] and until the Council on Environmental Quality had responded to the environmental impact statement filed with it by the Corps pursuant to 42 U.S.C.A. § 4332(2) (C). We thereafter concluded and so ruled that the work to be done by the Corps need not await such funding and such response. We then set the case for plenary hearing on April 3, 1972.

Another pre-trial conference was held on March 24, 1972, and it developed that the parties were far apart on the question as to which federal statutes are applicable and on the question as to the proper effect to be given to applicable statutes. It further developed that, because of the difficulty of resolving such problems, the Court could not do so at the conference and therefore continued

the conference until March 29, 1972 to give the Court an opportunity in the meantime to consider these questions and make appropriate rulings. Such rulings are necessary before other matters to be disposed of at the conference can be resolved. The purpose of this memorandum decision is to indicate such rulings.

The first statute that plaintiffs contend that the Corps will be violating in proceeding with the enlargment and realignment of the channel of these rivers is 33 U.S.C.A. § 701c, which provides in relevant part:

> ". . . No money appropriated under authority of section 701f of this title shall be expended on the construction of any project until States, political subdivisions thereof, or other responsible local agencies have given assurances satisfactory to the Secretary of the Army that they will (a) provide without cost to the United States all lands, easements, and rights-of-way necessary for the construction of the project, except as otherwise provided herein; (b) hold and save the United States free from damages due to the construction works; (c) maintain and operate all the works after completion in accordance with regulations prescribed by the Secretary of the Army . . . ."

It appears without dispute that the Governor of Tennessee, pursuant to an enabling statute enacted for this purpose in 1959, gave the Secretary of the Army assurances that the State would perform in accordance with the above-quoted provision. However, it also appears that by 1970, the Corps was advised by the Governor that the legislature had failed to make a current appropriation to allow the continuance of this project and that the State did not consider itself contractually bound unless an appropriation was made. Plaintiffs therefore contend that the Corps cannot proceed without a

---

2. The plan of mitigation has to do with mitigating the ecological adverse effect of the work to be done by the Corps.

proper "sponsoring agency" which it does not have.

■ We conclude that plaintiffs' contention must fail for at least two reasons. In the first place, it appears that, in providing that there must be "assurances satisfactory to the Secretary of the Army," the statute commits the decision to agency discretion and that therefore there is no "law to apply" here; accordingly, we are prohibited, under 5 U.S.C.A. § 701, from reviewing the Secretary's acceptance of assurances from local authorities. Citizens to Preserve Overton Park, Inc. et al. v. Volpe et al., 401 U.S. 402, 410, 91 S.Ct. 814, 28 L. Ed.2d 136 (1971). Secondly, it appears that plaintiffs do not have standing to complain about a failure to comply with the aforesaid statutory provision. The interest that the plaintiffs seek to protect is that of ecology; and since such interest is not arguably within the zone of interest intended to be protected by this statutory provision, they do not have standing. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L. Ed.2d 184 (1970). Moreover, the only conceivable way in which plaintiffs could suffer harm from a failure to comply with this statute would be harm from a failure to maintain the enlarged and realigned channels. And since it is the very maintenance of the enlarged and realigned channels, after the work is done, that will continue to do ecological damage (and, conversely, the failure to do so that would reduce such damage), plaintiffs will not in fact be harmed by a failure of the State of Tennessee to maintain these channels. Accordingly, having no "sponsoring agency" would not cause plaintiffs injury in fact and thus, for this reason also, they have no standing. Association of Data Processing Service Organizations, Inc., *supra.*

Defendants are therefore entitled to summary judgment insofar as plaintiffs rely on 33 U.S.C.A. § 701c.

Plaintiffs also rely on the Fish and Wildlife Coordination Act of 1958 (16 U.S.C.A. § 661 et seq., hereinafter "Act of 1958") and the National Environmental Policy Act of 1969 (42 U.S.C.A. § 4321 et seq., hereinafter "NEPA").

It should be noted at this point that this project was authorized in 1948 (Flood Control Act of 1948) but the work did not begin until the early 1960's, and since then it has been carried on intermittently and is not substantially completed.[3]

Under 16 U.S.C.A. § 662(a), the Corps is required to "consult with" the U. S. Fish and Wildlife Service of the Department of the Interior, and with the concerned State agency with a view to conservation of wildlife resources as well as development and improvement of such resources in connection with the project. Under § 662(b) the Corps is required to give "full consideration" to the views of those agencies. Under § 662(c), the Corps is authorized to modify or add to the structures of the project and to acquire lands in accordance with § 663 to promote conservation as part of the project, provided such is compatible with the purpose of the project and is justifiable and is treated as part of the cost of the project. § 663(a) provides that the Corps shall make "adequate provision," consistent with the primary purpose of the project, for the use of these rivers as well as the land acquired in connection with the project, for the conservation of and development of wildlife resources pursuant to the provisions of § 662.

NEPA, which became effective January 1, 1970, states its purposes to be (42 U.S.C.A. § 4321), *inter alia,* to declare a national policy of encouraging harmony between man and environment, to promote efforts to prevent damage to the environment, and to enrich understanding of ecological systems. In § 4331(a) it is declared, *inter alia,* to be the continuing policy of the Federal government to use all practicable means to pro-

---

3. The Corps estimates that it is about 30% completed.

mote general welfare, maintain conditions in which man and nature can be in harmony, and fulfill the social, economic and other requirements of present and future generations of Americans. In § 4331(b) it is provided, *inter alia,* that, in order to carry out the policies of the Act, it shall be the continuing responsibility of the Federal government to use all practicable means to improve Federal plans and programs to the end that the nation may fulfill responsibilities to future generations, assure all Americans safe, healthful and pleasing surroundings, attain widest use of environment without degradation, preserve an environment that supports diversity and variety of individual choice, and enhance the quality of renewable resources. In § 4332(1) it is provided that other statutes are to be interpreted and administered in accordance with policies of the Act. In § 4332(2), it is provided, *inter alia,* that all agencies of the Federal government are required to use an interdisciplinary approach to insure integrated use of natural and social science and the environmental design arts in decision making, to develop methods, in consultation with the Council on Environmental Quality, to insure that presently unqualified environmental values may be given due consideration in decision making with economic and technical considerations, to include in every proposal for every major Federal action significantly affecting the environment a detailed statement covering matters set out therein (the environmental impact statement heretofore referred to), to consult with environment-oriented agencies before making the statement and include their views in the statement, and to develop alternatives to recommended courses of action where there are unresolved conflicts with other agencies.

Pursuant to the aforesaid provisions in the Act of 1958, the Corps in 1963, stating that it had been in consultation with the Fish and Wildlife Service and the Tennessee Game and Fish Commission, submitted a mitigation report to Congress. It stated that Fish and Wildlife had proposed, *inter alia,* that the channel work in the headwaters of the rivers be limited to removal of obstructions which are creating persistent backwater, or alternatively, that the Corps acquire 12,500 acres of land for the use of the Game and Fish Commission and that the Corps construct management facilities on this acreage. The Corps commented that the limited channel work was incompatible with the purpose of the project (flood control and drainage) and that the acquisition of the acreage was compatible but not economically justifiable. The Corps did, in the report, approve some of the minor suggestions of the Fish and Wildlife Service.

The Corps has, under date of March, 1971, prepared a "Fish and Wildlife Mitigation Plan" pursuant to the Act of 1958 and NEPA. It appears, from the testimony of the District Engineer, Col. Parish, that the plan has been tentatively approved by the Chief of Engineers, but is now being circulated for comments by other agencies. Ultimately, it appears, the plan will come back to the Chief for final approval, then be transmitted to the Secretary of the Army, from whence it goes, through the Department of Defense, to the Office of Management and Budget and then to Congress. This plan contains, among other things, a proposal to acquire 14,400 acres for mitigation purposes as well as other mitigation proposals. However, it also appears from the plan that the Tennessee Game and Fish Commission contends that 44,425 acres should be acquired. It further appears from the record that the Fish and Wildlife Service believes that even more acreage should be acquired, and that the mitigation plan of the Corps has been declared to be inadequate by Bureau of Recreation of the Department of the Interior, the U. S. Forest Service of the Department of Agriculture and the Tennessee Health Department.

The Corps has also, pursuant to the requirements of NEPA, submitted an environmental impact statement, under

date of March, 1971, which includes the mitigation plan prepared by the Corps, to the Council on Environmental Quality.

■■ We do not understand defendants to contend that Act of 1958 and NEPA do not apply here, though defendants would not give these statutes the effect that plaintiffs contend they must be given. We also do not understand defendants to contend that the proposal of the Corps to continue work on this project is not reviewable by this Court. In any event, it is clear that this agency action is reviewable since review is not prohibited by statute and the challenged action by the Corps is not committed by the statutes to its discretion. See Citizens to Preserve Overton Park, *supra*, 401 U.S. at 410, 91 S.Ct. 814, 28 L.Ed.2d 136. We further conclude that the action by the Corps must, under 5 U.S.C.A. § 706, be enjoined if it is arbitrary, or otherwise not in accordance with law or failed to meet procedural requirements of the statutes. See Citizens to Preserve Overton Park, 401 U.S. at 413–417, 91 S.Ct. 814.[4]

Plaintiffs contend that the Corps did not, as is required by 16 U.S.C.A. § 662(a), in good faith consult with the other agencies with a view to conservation and development of wildlife resources. More importantly, plaintiffs contend that, construing § 662(c) and § 663(a) together, the Corps may not proceed further with the project until an adequate mitigation proposal or at least its current mitigation proposal has been funded by Congress (a contention we have, as heretofore stated, already overruled) or in any event until its mitigation proposal is tendered to Congress. Defendants on the other hand contend that the only obligation of the Corps is to "consult with" the other agencies in good faith as is required under § 662(a) and that it need not make a mitigation

proposal, and that, if a mitigation proposal must be tendered to Congress, that proposal proffered in 1963, heretofore referred to, satisfies such requirement.

■ It is completely clear from a reading of the provisions of 16 U.S.C.A. § 661 et seq. that a construction agency such as the Corps must consult in good faith with the ecology agencies and give their recommendations due consideration and, if mitigation is approved and funded by Congress, carry out the plan of mitigation. It also seems clear from Senate Report No. 1981 (U.S.Code Cong. & Admin.News, 85th Congress, 2nd Session, 1958, p. 3446) that it is contemplated that *a plan* of mitigation be submitted to Congress by the construction agency when Congress is asked to appropriate funds for the project itself even though, as here, the project had already been generally authorized.[5] Not only does the Senate Report so say but also it would obviously be almost fruitless not to provide funding for the channelization and for whatever mitigation is to be funded at the same time so that the work could proceed concurrently. This conclusion covers those items of the involved project that have not yet been funded by Congress, but does not cover the Mengelwood item that is next in line for completion and which is already funded. With respect to this item, and considering only the Act of 1958, it is quite arguable that the mitigation report to Congress of 1963 would be sufficient. However, in the light of the requirement of NEPA (§ 4332(1)) that the Act of 1958 be interpreted and administered in accordance with NEPA and (§ 4331(b)) that all Federal plans and programs be improved to attain environmental objectives, we believe that the Act of 1958 must be interpreted to require the Corps to submit a new plan of mitigation to Congress before it proceeds further with its Mengelwood item.

---

4. See also our interpretation of the Supreme Court's statement with respect to the scope of review in our opinion following remand in 335 F.Supp. 873 at 875–876.

5. Indeed § 662(c) itself makes it clear that the provisions of the Act of 1958 apply to projects even though they are already generally authorized by a specific act of Congress.

With respect to NEPA, we believe that, at the plenary hearing, we will be concerned with the question whether the Corps, in deciding to go ahead with this project and in formulating its current mitigation plan, used an interdisciplinary approach, developed procedures in consultation with the Council to insure that unquantified values would be given due consideration, and studied and developed alternatives. We will also be concerned with whether the environmental impact statement satisfies the requirements of NEPA. See Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 728 and 325 F.Supp. 749 (E.D.Ark.1971).