RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0293p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NATIONAL ECOLOGICAL FOUNDATION, et al.,

        *Plaintiffs-Appellees,*

    *v.*

CLIFFORD ALEXANDER, Secretary of the Army, and U.S. ENVIRONMENTAL PROTECTION AGENCY,

        *Defendants-Appellees,*

TENNESSEE DEPARTMENT OF CONSERVATION, TENNESSEE DEPARTMENT OF PUBLIC HEALTH, and OBION-FORKED DEER RIVER BASIN AUTHORITY, et al.,

        *Defendants-Appellants.*

No. 06-5700

>

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 78-02548—J. Daniel Breen, District Judge.

Submitted: April 24, 2007

Decided and Filed: August 3, 2007

Before: SUHRHEINRICH, CLAY, and SUTTON, Circuit Judges.

---

**COUNSEL**

**ON BRIEF:** Sohnia W. Hong, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, Barry Turner, OFFICE OF THE ATTORNEY GENERAL, ENVIRONMENTAL DIVISION, Nashville, Tennessee, for Appellants. William Siler, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, John C. Hayworth, Robert J. Walker, John L. Farringer IV, WALKER, TIPPS & MALONE, Nashville, Tennessee, for Appellees.

     CLAY, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined. SUTTON, J. (p. 13), delivered a separate opinion concurring in the judgment.

---------------

**OPINION**

---------------

CLAY, Circuit Judge.  The Stokes Creek canal is a channelized stream in western Tennessee. Defendants, the West Tennessee River Basin Authority (the "WTRBA") and the Tennessee Department of Environment and Conservation (collectively the "State"), wish to transform 1.5 miles of this stream into a 2.4 mile "meandering channel," which, according to the State, would mimic the natural conditions of a stream and provide significant environmental benefits.  This project is known as the Stokes Creek Restoration Project (the "Restoration Project").  The State intends to implement the Restoration Project independently of the Army Corps of Engineers (the "Corps"), who is primarily responsible for the West Tennessee Tributaries Project, a federal project to improve rivers and other waterways in the same general geographic area.

On October 3, 2005, the State filed a motion to clarify its obligations under a 1985 consent decree known as the "Agreed Order," seeking a declaration from the district court that the Agreed Order did not prohibit the State from implementing the Restoration Project.  Plaintiff National Ecological Foundation and Intervenors National Wildlife Federation and Tennessee Wildlife Federation, f/k/a Tennessee Conservation League (collectively "NEF") opposed the motion on the ground that the Agreed Order prohibited the State from undertaking the Restoration Project.  The district court denied the State's motion for clarification; the State subsequently filed a motion to alter or amend judgment pursuant to Federal Rule of Civil Procedure 59(e), which the district court also denied.  The State then brought this appeal challenging the district court's denial of its motion to alter or amend judgment.  For the reasons stated below, we **REVERSE** the district court's denial of the State's motion for clarification and **REMAND** with instructions that the district court grant the State's motion for clarification consistent with this opinion.

**BACKGROUND**

The roots of this case date back to the Flood Control Act of 1948, Pub. L. No. 80-858, § 203, 62 Stat. 1171, 1175, 1178.  By this Act, Congress "adopted and authorized" multiple "works of improvement for the benefit of navigation and the control of destructive floodwaters and other purposes," including a "project for improvement of the Mississippi River below Cape Girardeau with respect to the West Tennessee tributaries."  *Id.*  The Corps was primarily responsible for implementing these improvements.  Although work was authorized in 1948, it did not begin until the early 1960s.  *See Akers v. Resor*, 339 F. Supp. 1375, 1378 (W.D. Tenn. 1972).  The West Tennessee Tributaries Project ("WTT Project"), as authorized by Congress and planned by the Corps, was to consist of "224.9 miles of channel improvement."  J.A. at 134.

In 1970, a group of plaintiffs, including J. Clark Akers, brought an action seeking injunctive relief, claiming that the WTT Project violated various federal statutes.  *Akers*, 339 F. Supp. at 1376-78.  As of March, 1971, the Corps was circulating a plan, eventually to be submitted to Congress, containing a proposal to acquire "mitigation lands."[1]  In 1974, Congress enacted the Water Resources Development Act of 1974, Pub. L. No. 93-251, § 3, 88 Stat. 12, 14, which authorized the Corps "to acquire thirty-two thousand acres of land for the mitigation of fish and wildlife resources, recreation, and environmental purposes" in connection with the WTT Project.  In January of 1978, the *Akers* district court enjoined the WTT Project, which was approximately 32% complete at the time.  *Akers v. Resor*, 443 F. Supp. 1355, 1357, 1361 (W.D. Tenn. 1978).  *Akers* held that the Corps

-----------------------

[1]"Mitigation" refers to mitigating the adverse ecological effects of the WTT Project.  *See Akers*, 339 F. Supp. at 1377 n.2.

had failed to comply with the National Environmental Policy Act of 1969, Pub. L. 91-190, 83 Stat. 852 (codified as amended as 42 U.S.C. §§ 4321-4370f). *Id.* at 1361.

On September 28, 1978, the National Ecological Foundation brought this action against the Corps, the United States Environmental Protection Agency, the Governor of Tennessee, and several Tennessee agencies, including the Obion-Forked Deer Basin Authority (the "Basin Authority"), which is the predecessor agency to the WTRBA. The complaint identified the Basin Authority as "an agency of the State of Tennessee and [it] is the local sponsoring agency responsible for maintenance of certain projects by the Corps." J.A. at 9. The complaint alleged that the Corps, in violation of various federal laws, was allowing the Basin Authority to "perform[] activities on rivers and streams without the necessary permits and in violation of applicable laws and regulations." J.A. at 11. The complaint contended that this activity would irreparably destroy the affected area's wetlands. The National Ecological Foundation asked for various types of injunctive relief, including that the Corps issue a cease and desist order to all persons doing work in the Obion and Forked Deer rivers and the wetlands surrounding those rivers, that the Corps process permit requests according to law, and that the Basin Authority be enjoined from further work in the area of the Obion and Forked Deer rivers until it had obeyed the district court's injunctions concerning unlawful operations.

The parties settled this lawsuit by entering into a consent decree on May 13, 1985, the same day that the lawsuit in *Akers* was settled. NEF characterizes these settlements as "a negotiated overall scheme for river improvement projects in the Obion and Forked Deer River Basin." NEF's Br. at 18. The consent decree in *Akers* (the "*Akers* Order") required the Corps to acquire 32,000 acres of mitigation lands, specified the boundaries from within which those mitigation lands should be acquired, and agreed upon a general time frame for acquiring mitigation lands as the WTT Project progressed. The consent decree in this case, known as the "Agreed Order," is at the heart of this dispute and is discussed in detail below. Generally, the Agreed Order imposed restrictions upon the Basin Authority with respect to its work in the basin of the Obion and Forked Deer rivers.

After the *Akers* Order and Agreed Order were in force, the Corps attempted to resume work on the WTT Project. However, the Corps' inability to obtain a permit required by Tennessee law prevented the WTT Project from moving forward. In April of 1990, after eventually acquiring a total of 13,527 acres of mitigation lands, the Corps began to undertake measures to shut down the WTT Project in an orderly fashion. In 1992, however, then-Governor of Tennessee Ned McWherter requested that the Corps reactivate the WTT Project. This led to the formation of the West Tennessee Tributaries Steering Committee (the "Steering Committee"), which included representatives of federal, state, and local agencies, and representatives of private interests. The Steering Committee produced a "Mission Plan for Reformulation of the West Tennessee Tributaries Project." J.A. at 148. The Steering Committee's "conceptual plans for reformulation of the WTT [Project] . . . include[d] project features designed to return more natural functions to significant reaches of the river floodplains." J.A. at 156. Meandering river channels were predicted to "help to remove artificially ponded water on the floodplain and provide vastly improved aquatic and terrestrial habitats."[2] J.A. at 156. "To demonstrate how the river restoration concept would be implemented," a plan was developed for two bodies of water, including the "Stokes Creek subwatershed." J.A. at 156-57. These projects were known as "demonstration projects," and the project involving Stokes Creek was termed the "Stokes Creek Restoration Demonstration." J.A. at 157, 185. These demonstration projects were intended to provide "an opportunity to research and document the benefits of levee removals." J.A. at 185-86. "[The] Stokes Creek restoration includes channel restoration, levee removal, wetlands restoration, channel stabilization, riparian buffer strips,

---

[2] "Meander" in this context refers to "a turn or winding of a stream." Webster's Third New International Dictionary of the English Language Unabridged 1399 (1993).

and a bridge/embankment modification." J.A. at 157-58. The project's anticipated benefits included flood relief and better habitat for aquatic wildlife.

In June of 1996, the Corps issued a West Tennessee Tributaries Project Limited Reevaluation Report (the "Reevaluation"). The Reevaluation considered the Stokes Creek Restoration Demonstration, and concluded that the project captured tangible and intangible benefits. The Reevaluation also examined the issue of whether the Steering Committee's plan, which included the Stokes Creek Restoration Demonstration, could be implemented under the Corps' existing authority. The Reevaluation concluded that "the two demonstration projects formulated in the State Mission Plan have Federal interest and can be implemented under existing authority at the approval of the President of the Mississippi River Commission as minor modifications to the Authorized West Tennessee Tributaries Project." J.A. at 265.

A memorandum issued on June 13, 1996, from the Mississippi River Commission President Designee to the Director of Civil Works for the Corps addressed the continued applicability of the *Akers* Order. The memorandum concluded that, with the project implemented as a minor modification to the existing WTT Project, the *Akers* Order would apply to the Corps, and under the terms of the *Akers* Order mitigation lands would have to be acquired. The estimated cost of acquiring such lands was fourteen million dollars, which was significant, because the Stokes Creek Restoration Demonstration and the other demonstration project combined would only require approximately 6.6 million dollars to complete. Accordingly, the memorandum concluded that "implementation in accordance with the [*Akers* Order] does not appear to be a wise investment of Federal funds," and advised that "[m]odification of the [*Akers* Order] is achievable and necessary." J.A. at 275. Despite the Corps' optimism, an agreement to modify the *Akers* Order was never reached, and the reformulated WTT Project was never implemented. As the Corps stated in its response to the State's motion to clarify, "[t]he Corps no longer has any expectation for such a consensual waiver and has no immediate plans to proceed with the Stokes Creek demonstration project." J.A. at 44.

Effective July 1, 1996, the Tennessee General Assembly created the WTRBA (the successor agency to the Basin Authority), and empowered it with the authority to "restore where practicable, in a self sustaining manner, natural stream and floodplain dynamics and associated environmental and economic benefits." 1996 Tenn. Pub. Acts ch. 890, § 2(b)(2) (codified as amended at Tenn. Code Ann. § 64-1-1101(b)(2)). The WTRBA is currently seeking to "implement a project that would re-establish a meandering channel in Stokes Creek," J.A. at 22, which we refer to as the Restoration Project for the purpose of this opinion. The Restoration Project is, in effect, the Stokes Creek Restoration Demonstration contemplated by the Steering Committee. According to the affidavit of David Salyers, the Executive Director of the WTRBA, the State intends to undertake the Restoration Project using entirely local and state funds, acting independently of federal funding. The Restoration Project seeks to convert about 1.5 miles of channelized stream into 2.4 miles of meandering channel, to be implemented along miles 0.4 to miles 2.2 of the Stokes Creek canal. The dimensions of the new channel have been designed so "as to mimic the natural stream shape and geometry appropriate to this area." J.A. at 40. This will be accomplished by utilizing a combination of explosives, amphibious equipment, a trackhoe and a low ground pressure bulldozer.

On October 3, 2005, the State filed a motion for clarification of the Agreed Order. Although the State intends to seek all appropriate permits for the project, it sought a declaration from the district court that it was not required to purchase mitigation lands pursuant to either the Agreed Order or the *Akers* Order. Specifically, the State asked the district court to declare that the Restoration Project was "not in contravention of the Agreed Order." J.A. at 23. The State argued that the district court should rule "that the Agreed Order means what it says: that Stokes Creek is not part of the WTT Project." J.A. at 23. The State also argued that because "Stokes Creek is not

part of the WTT Project, the Corps is not required to purchase mitigation lands before WTRBA may proceed with its project." J.A. at 23.  NEF opposed the State's motion; the Corps did not.

On November 23, 2005, the district court, in a summary order, denied the State's motion for clarification.[3]  On December 6, 2005, the State filed an unopposed motion for an extension of time to file a motion to alter or amend the judgment.  The district court granted this motion on December 7, 2005.  The State thereafter filed a motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e).  In its motion to alter or amend the judgment, the State argued that Stokes Creek was not part of the WTT Project, and even if it was, nothing in the Agreed Order prevented the State from performing the Restoration Project independently of the Corps.  On January 6, 2006, the district court denied the State's Rule 59(e) motion.  On March 3, 2006, the State filed a notice of appeal.

## DISCUSSION

## I.

## Jurisdiction

"This Court has an independent obligation to determine whether subject matter jurisdiction exists in a given case." *Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc.*, 452 F.3d 494, 504 (6th Cir. 2006).  The notice of appeal in this case challenges the district court's January 6, 2006 denial of the State's motion to alter or amend the judgment.  This motion was made pursuant to Federal Rule of Civil Procedure 59(e), which states that "[a]ny motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment."  The State's motion to alter or amend the judgment was not filed within 10 days of the judgment–the district court's judgment was filed on November 23, 2005 and the State, instead of filing a motion pursuant to Rule 59(e), responded within ten days with an unopposed motion for an extension of time to file its Rule 59(e) motion.  The district court granted the extension on December 7, 2005, which was within the ten day period for filing the motion to alter or amend.[4]  The State's Rule 59(e) motion was finally filed on December 14, 2005, more than ten days after the challenged judgment.  The district court denied the State's motion on January 6, 2006, and a notice of appeal was filed on March 3, 2006.  Thus, the notice of appeal, the filing of which is jurisdictional, *Bowles v. Russell*, 127 S. Ct. 2360, 2362 (2007), was filed within the 60 day filing requirement pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B) counting from January 6, 2006, but was untimely if the clock started ticking on November 23, 2005.  A properly filed Rule 59(e) motion tolls the period for filing a notice of appeal; Fed. R. App. P. 4(a)(4)(A)(iv), a Rule 59(e) motion filed out of time, however, does not have the same effect.

---

[3]The district court's order states in full:

> This matter is before the Court on the motion of the West Tennessee River Basin Authority ("WTRBA") and the Tennessee Department of Environment and Conservation ("TDEC"), acting through the Tennessee Attorney General and Reporter, for clarification of a May 13, 1985 Agreed Order entered in this matter.  The Court, having considered the motion, the responses to the motion filed by other parties to this matter, and the record as a whole, has determined that the Stokes Creek Demonstration Project proposed by WTRBA is within the United States Army Corps of Engineers' authorized West Tennessee Tributaries Project and that, accordingly, WTRBA's and TDEC's motion should be DENIED.

J.A. at 286.

[4]Because the deadline established under Rule 59(e) is shorter than 11 days, weekends and legal holidays are excluded from the computation of the deadline.  Fed. R. Civ. P. 6(a).

NEF argues that the Court lacks jurisdiction to hear this appeal. It reasons that, notwithstanding the district court's motion granting the State an extension of time to file its Rule 59(e) motion, the motion was nevertheless untimely filed. Federal Rule of Civil Procedure 6(b) states that the district court "may not extend the time for taking any action under Rule[] . . . [59(e)] . . . , except to the extent and under the conditions stated in [Rule 59(e)]." *See Rhoden v. Campbell*, 153 F.3d 773, 774 (6th Cir. 1998) (holding that the district court cannot extend the time for filing a Rule 59(e) motion by margin order). NEF argues that since the State's Rule 59(e) motion did not toll the time for the State to file an appeal, the State's notice of appeal is untimely, as it was not filed within sixty days of the district court's November 23, 2005 order.

We reject this argument because two recent Supreme Court cases require us to conclude that the time limits set by Rules 6 and 59(e) constitute an affirmative defense to an untimely Rule 59(e) motion, which the party opposing the motion is capable of forfeiting.[5] *See Eberhart v. Untied States*, 546 U.S. 12, __, 126 S. Ct. 403, 406-07 (2005) (per curiam); *Kontrick v. Ryan*, 540 U.S. 443, 456 (2004). At issue in *Kontrick* was Federal Rule of Bankruptcy Procedure 4004(a), which provides that "a complaint objecting to the debtor's discharge under § 727(a) of the [Bankruptcy] Code shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a)." Rule 4004(b) allows this time limit to be extended, but only "for cause," by a motion "filed before the time has expired." This time limitation is "reinforced" by Rule 9006(b)(3), which provides that "the time for taking action" under Rule 4004(a) can be extended "only to the extent and under the conditions stated in [that rule]." *See Kontrick*, 540 U.S. at 448 (brackets in original) (quoting Rule 9006(b)(3)). A unanimous Court first concluded that "claim-processing" rules such as Rules 4004 and 9006 did not affect the subject matter jurisdiction of the lower courts.[6] *Id.* at 454. The Court then noted a "critical difference between a rule governing subject-matter jurisdiction and an inflexible claim-processing rule. . . . [A] claim-processing rule, . . . even if unalterable on a party's application, can nonetheless be forfeited if the party asserting the rule waits too long to raise the point." *Id.* at 456. The Court held that Kontrick had forfeited the defense of untimeliness by failing to raise the issue until after trial. *Id.* at 458-60.

In a per curiam decision, a unanimous Court in *Eberhart* extended *Kontrick*, and held that Federal Rules of Criminal Procedure 33 and 45(b)(2) were claim-processing rules, and an objection based on the timeliness of a motion for a new trial could likewise be forfeited. As the Rules read at the time of *Eberhart*,[7] Rule 33 allowed a district court to "vacate any judgment and grant a new trial if the interest of justice so requires," but required that "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty, or within such further time as the court sets during the 7-day period." *Eberhart*, 546 U.S. at __, 126 S. Ct. at 403 (bracketed text in original) (quoting Fed. R. Crim. P. 33(a)). Rule 45(b)(2) made Rule 33's time limit rigid by providing that "the courts 'may not extend the time to

---

[5] In *Feathers v. Chevron U.S.A., Inc.*, 141 F.3d 264, 268-69 (6th Cir. 1998), we held that this Court can construe an untimely motion to alter or amend a judgment under Rule 59(e) as a motion for relief from judgment under Rule 60(b). While *Kontrick* and *Eberhart* mean that a court need not go through these gymnastics where the party opposing the motion has forfeited his defense of untimeliness, we express no opinion on the propriety of this procedure in a case where such a defense was properly asserted.

[6] The Court relied in part on Rule of Bankruptcy Procedure 9030, which states that "[t]hese rules shall not be construed to extend or limit the jurisdiction of the courts or the venue of any matters therein." The Court concluded that "[c]lassifying time prescriptions, even rigid ones, under the heading 'subject matter jurisdiction' can be confounding. Clarity would be facilitated if courts and litigants used the label 'jurisdictional' . . . only for prescriptions delineating the classes of cases (subject matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority." *Kontrick*, 540 U.S. at 455 (brackets, internal citations and quotation marks omitted).

[7] Rule 33 was amended in 2005 to allow the district court discretion to grant a defendant an extension of time to move for a new trial, and corresponding amendments were made to Rule 45(b).

take any action under [Rule 33].'" *Id.* at __, 126 S. Ct. at 403 (bracketed text in original) (quoting Fed. R. Crim. P. 45(b)(2)). The Court stated that it was "implausible that the Rules considered in *Kontrick* can be nonjurisdictional claim-processing rules, while virtually identical provisions of the Rules of Criminal Procedure can deprive federal courts of subject matter jurisdiction." *Id.* at __, 126 S. Ct. at 405. The rules in *Eberhart* "closely paralleled" those in *Kontrick*: Criminal Procedure Rule 33(a) and Bankruptcy Procedure Rule 4004(a) both provided a movant with a set time period in which to file a motion with the court, and Criminal Procedure Rule 45(b)(2) and Bankruptcy Procedure Rule 9006(b)(3) each admonished the court that it could not extend the time to take action under those rules' respective counterparts. Faced with indistinguishable circumstances, the Court reached the same result, and held that the rules at issue were "claim-processing rules" that "assure[d] relief to a party properly raising them, but do not compel the same result if the party forfeits them." *Id.* at ___, 126 S. Ct. at 407.

Most recently, in *Bowles*, the Court considered the issue of whether the time limit for filing a notice of appeal affected the jurisdiction of the federal courts of appeals. The Court concluded that the time limit for filing a notice of appeal was jurisdictional. *Bowles*, 127 S. Ct. at 2362. This was so because, unlike the rules at issue in *Kontrick* and *Eberhart*, which were "procedural rules adopted by the Court," the time limit for filing a notice of appeal was "set forth in a statute." *Id.* at 2364-65 (noting "the jurisdictional distinction between court-promulgated rules and limits enacted by Congress"); *see* 28 U.S.C. § 2107(a).

Unlike the rule at issue in *Bowles*, Rule 59(e) is a Federal Rule of Civil Procedure promulgated by the Supreme Court under the Rules Enabling Act, 28 U.S.C. §§ 2071-2072. Moreover, no principled distinction exists between the rules at issue in *Kontrick* and *Eberhart* and the structure created by Federal Rules of Civil Procedure 6(b) and 59(e). Since these rules are indistinguishable from those in *Kontrick* and *Eberhart*, we conclude that they are claim-processing rules that provided NEF with a forfeitable affirmative defense. *See In re Onecast Media, Inc.*, 439 F.3d 558, 562 (9th Cir. 2006) (holding that *Kontrick* and *Eberhart* require the conclusion that Rule 59(e) is a claim-processing rule).

NEF does not contest that it "did not raise the issue of untimeliness of the State's Rule 59(e) motion at the District Court level." NEF's Br. at 4. Instead, NEF agreed not to contest the State's motion for an extension of time in which to file its Rule 59(e) motion, and it raised the issue of timeliness for the first time in its brief on appeal. "A party indisputably forfeits a timeliness objection based on a claim-processing rule if he raises the issue after the court has issued a merits decision." *Wilburn v. Robinson*, 480 F.3d 1140, 1147 (D.C. Cir. 2007). Because the district court ruled on the State's Rule 59(e) motion before NEF raised the issue of untimeliness, NEF has forfeited its timeliness defense.

Nevertheless, NEF contends that "[t]he time for appealing the November 23, 2005 Order was not tolled because the State's Rule 59(e) motion was untimely." NEF's Br. at 4; *see Wilburn*, 480 F.3d at 1153 (Brown, J. dissenting) ("Courts applying *Eberhart* or *Kontrick* to time constraints have, to date, addressed only the permissibility of late filings, not the effect late filings would have on subsequent deadlines."). As an initial point, we note that this argument would not prevent review of the State's Rule 59(e) motion, which constitutes a "judgment or order" under Rule of Appellate Procedure 4(a)(1). More fundamentally, however, we conclude that, where a party forfeits an objection to the untimeliness of a Rule 59(e) motion, that forfeiture makes the motion "timely" for the purpose of Rule 4(a)(4)(A)(iv). The Rules themselves do not define "timely," but we can discern no reason for holding that an otherwise properly filed motion that was considered by the district court would fail to toll the time for filing a notice of appeal. We conclude that we have jurisdiction to entertain the State's appeal.

## II.

## Merits

"We generally review a denial of a motion to alter or amend the judgment under Rule 59(e) for abuse of discretion." *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 554 (6th Cir. 1998) (citing *Huff v. Metro. Life Ins. Co.*, 675 F.2d 119, 122 (6th Cir. 1982)). However, to the extent that the motion to alter or amend was based on an erroneous legal doctrine, the standard of review is *de novo*. *See Huff*, 675 F.2d at 122 n.5 ("[W]hen the lower court rejects an application under Rule 59(e) based upon an erroneous legal doctrine, our standard of review is the same as in other cases of legal error."). Importantly, "[a] district court's interpretation of a consent decree or judgment is a matter of law subject to de novo review, and the underlying findings of fact are reviewed for clear error." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 371 (6th Cir. 1998). Therefore, to the extent that the district court's denial of the State's motion to alter or amend rests on a legal interpretation of the Agreed Order, we review its legal conclusions *de novo*.

As a preliminary matter, we note that the State's notice of appeal is sufficient to place the merits of the district court's November 23, 2005 denial of the State's motion to clarify before this Court. This is true notwithstanding the fact that the State's notice of appeal only explicitly references the district court's denial of its Rule 59(e) motion. "It has long been the rule 'that an appeal of a final judgment draws into question all prior non-final rulings and orders.'" *Caudill v. Hollan*, 431 F.3d 900, 905 (6th Cir. 2005) (quoting *McLaurin v. Fischer*, 768 F.2d 98, 101 (6th Cir. 1985)). In *Inge v. Rock Financial Corp.*, 281 F.3d 613, 618 (6th Cir. 2002), this Court held that a notice of appeal that only referenced a constructive Rule 59(e) motion sufficed to bring the district court's prior orders before the court of appeals because the parties had fully argued the merits of the prior orders. Since the parties here fully briefed the propriety of the district court's denial of the State's motion to clarify, we may properly consider the district court's November 23, 2005 order notwithstanding the State's limited notice of appeal.

We must resolve one more procedural issue before reaching the substance of the Agreed Order. In its brief in support of its motion to clarify, the State argued that the Restoration Project was not within the WTT Project area. On appeal, the State argues, *inter alia*, that nothing in the Agreed Order prohibits it from undertaking work independent of the Corps, irrespective of whether the Restoration Project is within the WTT Project area as defined by the Corps. NEF contends that we need not consider the State's argument because the State failed to raise this argument in its initial motion to clarify, instead raising it for the first time in its Rule 59(e) motion. "Rule 59(e) motions are 'aimed at reconsideration, not initial consideration.'" *FDIC v. World Univ., Inc.*, 978 F.2d 10, 16 (6th Cir. 1992) (quoting *Harley-Davidson Motor Co., Inc. v. Bank of New England*, 897 F.2d 611, 616 (1st Cir. 1990)). In *World University*, this Court held that the defendant's argument, which it raised for the first time in a Rule 59(e) motion, was barred where there was no reason why the defendant could not have presented its argument prior to its motion to alter or amend the judgment. *Id.*; *see also Engler*, 146 F.3d at 374 (holding that an argument was barred where the movant "could have, but did not, raise [its] argument before the district court ruled" in the original motion). This rule, however, does not cover the facts of this case. The State's motion to clarify was premised on the assumption that Stokes Creek was outside of the WTT Project area. As NEF concedes, it first raised the argument that Stokes Creek was within the WTT Project area in its response to the State's motion for clarification. Western District of Tennessee Local Rule 7.2 does not provide for a reply brief when filing motions in civil cases, and although the State was working on a motion to file a reply, the district court ruled on its motion to clarify six days after NEF's response, before the State was able to file a request for permission to file a reply. In light of these unique facts, the State's Rule 59(e) motion was the first opportunity for it to raise this argument.

Turning at last to the merits of the case, the first question we must answer is whether the Agreed Order prohibits the State from working independently of the Corps in the WTT Project area. Undisputedly, the State has the inherent power to alter or improve rivers and channels within its territory, absent some restraint upon that power. The only potential restraint upon that power that is germane to this appeal is the Agreed Order.

"A consent decree is essentially a settlement agreement subject to continued judicial policing." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983). It is a hybrid in the law, sharing features of both a voluntary settlement agreement that requires no judicial intervention and a final judgment order that throws the prestige of the court behind the compromise struck by the parties. *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994). The court's task in interpreting a consent decree is "to ascertain the intent of the parties at the time of settlement." *Huguley v. Gen. Motors Corp.*, 67 F.3d 129, 134 (6th Cir. 1995). The parties, however, frequently have competing goals in forming a consent decree. As the Supreme Court observed, "[t]he decree itself cannot be said to have a purpose; rather, the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971). Additionally, each party to a consent decree will frequently achieve a measure of what it could have hoped to obtain through litigation, but in exchange the party must waive its constitutional rights. Thus, "the conditions upon which [a party] has given that waiver must be respected, and the instrument must be construed as it is written," and not as if either party had obtained all that it sought in litigation. *Id.*; *see also Vanguards*, 23 F.3d at 1017 ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it or by what might have been written had the plaintiff established his factual claims and legal theories in litigation." (internal quotation marks omitted) (quoting *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 573 (1984))); *Williams*, 720 F.2d at 920 ("A consent decree . . . should be strictly construed to preserve the bargained for position of the parties.").

All parties agree that the consent decree in this case, the Agreed Order, regulates various aspects of the work performed by the Basin Authority in the Obion and Forked Deer River Basin. The dispute concerns whether the restrictions on the Basin Authority apply only to work performed in the State's role as the sponsoring agency of the Corps, as the State argues, or whether the Agreed Order restricts all work performed by the State in the Corps' WTT Project area to maintenance work, as NEF avers. The key language of the Agreed Order is found in paragraph 2:

> The Memorandum of Agreement . . . is attached hereto as Exhibit 1 to this Agreed Order and incorporated in this Agreed Order by reference. The Memorandum of Agreement contains certain studies and recommendations concerning procedures to be followed by the Obion-Forked Deer [River] Basin Authority, hereinafter referred to as Basin Authority, in performing future work in the Basin of the Obion and Forked Deer Rivers. The Basin Authority shall be, and is hereby, ordered, while this Agreed Order is in effect, to perform all future work in the Obion-Forked Deer River Basin in accordance with the procedures set forth in this Agreed Order and the Memorandum of Agreement and in accordance with applicable state and federal laws, provided, however, that if there be any conflict between the procedures required by the provisions of this Agreed Order and by the provisions of the Memorandum of Agreement, then and in such event the provisions of this Agreed Order shall govern.

J.A. at 64.

Paragraph 2 thus incorporates the Memorandum of Agreement, which contains five parts. Part A sets forth "modifications to the old project plan presently stopped by this litigation." J.A. at 75-76. Part B details the "specific role of the Authority with regard to maintenance of the Corps project and drainage problems above the Corps project." J.A. at 76. Part C sets forth conditions that apply "to the role of the Authority as set forth in part B," and Part D enumerates goals to be pursued by the parties. J.A. at 77. Finally, Part E incorporates by attachment "[g]uidelines for specific implementation." J.A. at 78.

Paragraph 8 also addresses the responsibilities of the Basin Authority. It states in relevant part:

> The Basin Authority is responsible for maintaining the West Tennessee Tributaries Project, which is a major federal project of the Corps of Engineers. The maintenance responsibilities of the Basin Authority include both the completed portions of the West Tennessee Tributaries Project and the portions to be completed by the Corps of Engineers in the future. The West Tennessee Tributaries Project is the subject of litigation in a case styled *Akers v. Resor, et al.,* Civil Action No. C-70-349 in the Western Division of the United States District Court for the Western District of Tennessee. As part of its responsibilities, the Basin Authority must acquire rights of way needed by the Corps of Engineers for its channelization of the main streams of the Obion and Forked Deer Rivers and for other work in the Basin including, but not limited to, construction of lateral drainage features.

J.A. at 68-69.

NEF argues that the effect of the Agreed Order is to limit the role of the State to "maintenance of the Corps' work within the WTT [Project] area and certain drainage problems above the WTT [Project] area." NEF's Br. at 37 (emphasis removed). Thus, under this reading, the State could not perform any independent work. According to NEF, this conclusion follows from examining three parts of the Agreed Order. First, the Agreed Order in paragraph 2 requires the Basin Authority to perform "*all future work* in the Obion-Forked Deer River Basin in accordance with the procedures set forth in this Agreed Order and the Memorandum of Agreement." J.A. at 64 (emphasis added). Second, the Memorandum of Agreement details "[t]he specific role of the Authority with regard to maintenance of the Corps project and drainage problems above the Corps project." J.A. at 76. Third, paragraph 8 of the Agreed Order asserts that "[t]he Basin Authority is responsible for maintaining the West Tennessee Tributaries Project, which is a major federal Project of the Corps of Engineers. The maintenance responsibilities of the Basin Authority include both the completed portions of the West Tennessee Tributaries Project and the portions to be completed by the Corps of Engineers in the future." J.A. at 68-69. In effect, NEF reads "all future work" as controlling, and it construes the rest of the Agreed Order, in particular the Memorandum of Agreement and paragraph 8, as implicitly limiting "all future work" to maintenance and drainage work.

While this reading of the Agreed Order is not wholly implausible, we conclude that the better reading of the Agreed Order is precisely the inverse of the interpretation proposed by NEF. That is, we read the rest of the Agreed Order, which fashions a specific role for the Basin Authority with respect to the WTT Project, to control the scope of the Agreed Order. Furthermore, we conclude that the phrase "all future work" in the Agreed Order must be construed by reference to the scope of the Agreed Order.

The scope of the Agreed Order is limited to the Basin Authority's role as the sponsor of the Corps' project;[8] in fact, NEF does not seriously contend that the specific provisions of the Agreed Order apply to any type of work on the part of the Basin Authority other than its work as the sponsor of the WTT Project. Against this backdrop, the Agreed Order's reference to "all future work"–a term not defined by the Agreed Order–is ambiguous. This ambiguity must be resolved in favor of the State for several reasons.

First, the complaint filed by NEF suggests that the Basin Authority was sued because of its role as the local sponsor of the Corps' project. The complaint identifies the Basin Authority as "an agency of the State of Tennessee and [it] is the local sponsoring agency responsible for maintenance of certain projects by the Corps." J.A. at 9. Furthermore, the substantive allegations of the complaint primarily focus on the activities of the Corps, and to the extent that the State is implicated, the complaint typically faults the Corps for permitting the State to perform the allegedly harmful work. *E.g.* J.A. at 11 ("Unless ordered by the Court to perform its duties, the Corps apparently will continue to allow the Basin Authority and others to destroy our rivers, streams and wetlands."). The fact that the allegations in the complaint focus on the State's role as sponsor of the Corps' project suggests that "all future work" should be limited to this role. *See Ahern v. Bd. of Educ. of Chicago*, 133 F.3d 975, 981-82 (7th Cir. 1998) ("Although the complaint that led to the consent decree is literally extrinsic to the decree, we are entitled to look to the complaint to ascertain the scope of the lawsuit that the decree was intended to settle.").

Second, nothing in the circumstances surrounding the formation of the Agreed Order indicates that any party was contemplating independent work by the State at the time that the Agreed Order was executed. *See United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975) (stating that "the circumstances surrounding the formation of the consent order" constitute an "aid to construction" properly employed in construing consent decrees or orders). Our review of the record reveals nothing suggesting that the intended scope of the Agreed Order extends beyond the WTT Project that spurred this litigation. The Restoration Project contemplated by the State involves substantively different work than that contemplated by the original WTT Project, and it would be implemented without assistance from the Corps. These features produce a drastically different climate from that which prevailed at the time that the Agreed Order was executed. Given the ambiguity of the language of the Agreed Order, we are hesitant to construe the Agreed Order in a manner that extends its prohibitions to novel factual circumstances that the Agreed Order does not clearly encompass.

Third, the power to improve waterways within the State for the benefit of the public implicates the State's powers as sovereign. *Cf. Withers v. Buckley*, 61 U.S. (20 How.) 84, 92 (1857) (noting a "power inseparable from every sovereign or efficient Government, to devise and to execute measures for the improvement of the State, although such measures that might induce or render necessary changes within the interior of a State . . ."). The nature of this power of the State makes us skeptical of NEF's claim that the State has voluntarily relinquished its ability to perform internal improvements through the Agreed Order, at least on these facts, where the language of the Agreed Order need not be read to produce this effect.

---

[8]This can be inferred from several provisions of the Agreed Order. Paragraph 2 establishes the procedures with which the Basin Authority must comply. Although paragraph 2 requires that all future work be performed "in accordance with the procedures set forth in this Agreed Order and the Memorandum of Agreement," J.A. at 64, the bulk of the Agreed Order's specifics are supplied through the Memorandum of Agreement. The Memorandum of Agreement begins by modifying the Corps' old project plan for the WTT Project. It then sets forth the role of the Basin Authority with respect to maintenance, and imposes detailed requirements upon the Basin Authority in performing this role. Paragraph 8 also implies that the Agreed Order addresses the State's role in maintaining the WTT Project. Paragraph 8 begins by affirmatively asserting that the State is responsible for maintaining the Corps' project; it then proceeds to require the State to acquire rights of way as part of its maintenance responsibilities.

Finally, contrary to NEF's characterization of the State's position, construing the Agreed Order not to prohibit the Restoration Project does not leave the State "free to do whatever work it desires, subject to no real restrictions or conditions." NEF's Br. at 44. Our conclusion that the Agreed Order does not prohibit independent work by the State does not free the State from the strictures of federal and state law. In the event that the Restoration Project violates federal or state law, NEF presumably will not be without recourse in the courts. This litigation, however, is not concerned with the legality or desirability of the State's proposed action; instead, the only question we must answer is whether this proposed course of action is prohibited by the terms of the Agreed Order. *See Armour*, 402 U.S. at 674-75 (noting that the party seeking to enforce the consent decree could have challenged the defending party's actions under federal law). In light of the ambiguity of the Agreed Order, we conclude that it does not prohibit the Restoration Project.

One final point: NEF does not argue that the State is independently bound by the *Akers* Order, as the State was not an party to that settlement. NEF also does not take the position that the State is independently subject to the mitigation lands requirement. We likewise conclude that the State is not subject to any requirement to purchase mitigation lands arising out of the Agreed Order or the *Akers* Order.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's denial of the State's motion to clarify, and **REMAND** with instructions that the State's motion to clarify be granted consistent with this opinion.

---

**CONCURRING IN THE JUDGMENT**

---

SUTTON, Circuit Judge, concurring in the judgment. I respectfully see this case differently. Unlike the majority, I find it unnecessary to decide whether *Bowles v. Russell*, 127 S. Ct. 2360 (2007), *Eberhart v. United States*, 546 U.S. 12 (2005), and *Kontrick v. Ryan*, 540 U.S. 443 (2004), compel us to determine that Rule 59(e) is a claim-processing rule. I instead believe we should adhere to the straightforward practice we have long employed when faced with an untimely Rule 59(e) motion—which is to construe the motion as a timely-filed Rule 60(b) motion. *See Feathers v. Chevron U.S.A., Inc.*, 141 F.3d 264, 268 (6th Cir. 1998) ("Where a party's Rule 59 motion is not filed within the mandatory 10-day period, it is appropriate for a court to consider the motion as a motion pursuant to Rule 60 for relief from judgment."); *see also, e.g.*, *Peake v. First Nat'l Bank & Trust Co. of Marquette*, 717 F.2d 1016, 1020 (6th Cir. 1983); *Lommen v. McIntyre*, 125 F. App'x 655, 658–59 (6th Cir. Mar. 10, 2005); *White-Bey v. McMeekin*, No. 98-2162, 1999 WL 1045106, at *1 (6th Cir. Nov. 10, 1999); *Parker v. Wilkinson*, No. 98-3611, 1999 WL 435150, at *1 (6th Cir. June 17, 1999); *Jobete Music Co., Inc. v. Holland*, No. 90-1664, 1991 WL 105750, at *2–3 (6th Cir. June 18, 1991); *Beerbower v. United States*, No. 85-1034, 1986 WL 16750, at *1 (6th Cir. Mar. 14, 1986).

If we construe the appellants' Rule 59(e) motion as a Rule 60(b) motion, we have jurisdiction to hear the appeal from the district court's denial of that motion. The district court denied the motion on January 6, 2006 and WTRBA and TDEC filed their notice of appeal on March 3, 2006, which is within 60 days of the entry of the district court's order. *See* Fed. R. App. P. 4(a)(1)(B) ("When the United States . . . is a party, the notice of appeal may be filed . . . within 60 days after the judgment or order appealed from is entered."). We do not, however, have jurisdiction to review the underlying judgment. *See Browder v. Dir., Dep't of Corr.*, 434 U.S. 257, 263 n.7 (1978) ("[A]n appeal from [the] denial of Rule 60(b) relief does not bring up the underlying judgment for review."); *GenCorp, Inc. v. Olin Corp.*, 477 F.3d 368, 373 (6th Cir. 2007).

We review the district court's denial of a Rule 60 motion for abuse of discretion. *Doe v. Lexington-Fayette Urban Co. Gov't*, 407 F.3d 755, 760 (6th Cir. 2005). The order reads in its entirety:

> This matter is before the Court on the motion of the West Tennessee River Basin Authority ("WTRBA") and the Tennessee Department of Environment and Conservation ("TDEC"), acting through the Tennessee Attorney General and Reporter, to alter or amend the Court's November 23, 2005 Order denying WTRBA's and TDEC's Motion for Clarification of May 13, 1985 Agreed Order. The Court, having considered the motion, the responses to the motion filed by other parties to this matter, and the record as a whole, has determined that the motion to alter or amend is not well taken and should be DENIED.

D. Ct. Order at 1. This two-sentence order—one sentence of which merely summarizes the procedural posture of the case, the other of which merely states a conclusion—makes it difficult, if not impossible, to conduct any meaningful review of the decision. Given both the lengthy history of the case and its complexity, I would remand the case to the district court with instructions to provide an explanation for its denial of the appellants' motion.